## LESLIE CRAINE *v.* TRINITY COLLEGE
### (SC 16557)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued September 26, 2001—officially released March 12, 2002

*Felix J. Springer*, with whom were *Elizabeth A. Alquist* and, on the brief, *Allan B. Taylor*, for the appellant (defendant).

*Wesley W. Horton*, with whom were *Jacques J. Parenteau* and *Daniel J. Krisch*, for the appellee (plaintiff).

*Opinion*

SULLIVAN, C. J. The defendant, Trinity College, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, Leslie Craine. The plaintiff, who had been denied tenure by the defendant, brought this action claiming age discrimination in violation of both the Age Discrimination in Employment Act, 29 U.S.C. § 623, and General Statutes § 46a-60, sex discrimination in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a)[1] and § 46a-60 (1999),[2] breach of contract, negligent misrepresentation, and negligent infliction of emotional distress. On appeal, the defendant claims that the trial court improp-

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a), provides in relevant part: "It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. . . ."

[2] General Statutes § 46a-60 provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section:

"(1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."

erly denied its motion for judgment notwithstanding the verdict because the plaintiff did not meet her burden of proving sex discrimination, breach of contract or negligent misrepresentation by the defendant. As to the sex discrimination claim, we agree with the defendant and reverse the trial court's denial of the defendant's posttrial motion for judgment notwithstanding the verdict. With respect to the contract and negligent misrepresentation claims, however, we affirm the trial court's denial of the defendant's motion for judgment notwithstanding the verdict. The defendant also claims that it is entitled to a new trial because the trial court failed to instruct the jury adequately not to second-guess the defendant's academic judgment and improperly admitted evidence comparing various tenure candidates. We disagree and, accordingly, affirm the trial court's denial of the defendant's posttrial motion for a new trial.[3]

The jury reasonably could have found the following facts. The defendant's faculty manual describes the relationship between the defendant and its faculty and sets out the defendant's criteria for hiring, reappointment and tenure. Basic requirements for appointment to a tenure-track position are professional competence, scholarly activity and fulfillment of the requirements for a Ph.D. or other terminal degree. Throughout the tenure track, an assistant professor is evaluated in teaching, scholarship and service.

Initial appointment is for three years, and an assistant professor is reviewed for reappointment for a two year

---

[3] Finally, the defendant asks us to set aside that part of the verdict awarding compensation for noneconomic damages under state antidiscrimination law because, the defendant argues, although the federal and state law are coterminous, the jury awarded noneconomic damages under only federal antidiscrimination statutes, but the trial judge awarded damages under state antidiscrimination statutes. We need not address this issue because we conclude that the plaintiff failed to present sufficient evidence to allow a jury reasonably to conclude that she was the subject of any discrimination.

contract extension after the second year. According to the defendant's faculty manual, at the time of first reappointment, an assistant professor must demonstrate: (1) "a clear indication of the development of teaching effectiveness"; (2) "evidence of promise and direction in scholarship"; and (3) "evidence of participation in the work of the department and/or program."

Reappointment is a multistep process that involves review by several levels of faculty and administration. Upon initiation of review, the tenured members of the candidate's department discuss the candidate's teaching, scholarship and service and then vote on a departmental recommendation. The chair of the department forwards the recommendation to the appointments and promotions committee, which is made up of faculty members and is responsible for evaluating all candidates for appointment, promotion or tenure. The appointments and promotions committee analyzes the departmental recommendation, the candidate's curriculum vitae, the candidate's statement, external letters of recommendation evaluating the candidate's file and examples of the candidate's work. That committee then makes a recommendation to the joint appointments and promotions committee that consists of faculty and administration. Trustee approval is the final step in promotion and the granting of tenure.

The plaintiff was hired by the defendant to begin teaching in the fall of 1987. She was appointed as a tenure-track, assistant professor in the chemistry department. In accordance with the faculty manual, the plaintiff underwent reappointment review in the spring of 1989, her second academic year with the defendant. Ultimately, she was reappointed and granted an additional two year contract. The letter from the appointments and promotions committee complimented her energy and commitment to teaching despite a more onerous course load than typically given to beginning

instructors. The letter also noted that the plaintiff had established a clear plan for research and writing. In May, 1989, the plaintiff was recommended for reappointment by the appointments and promotions committee.

In accordance with the faculty manual, review for the plaintiff's second reappointment occurred in the 1990–91 academic year, her fourth year of teaching. To be reappointed a second time, she was required to demonstrate: (1) evident development of teaching effectiveness and involvement in advising students and supervising student research; (2) early promise in scholarship coming to fruition and continuing, focused scholarly activities; and (3) manifest service to the department and beginning service to the college. According to the faculty manual, the second reappointment process duplicates the first reappointment review, and, again, a favorable decision results in an additional two year contract and review for tenure.

In the plaintiff's statement to the appointments and promotions committee, she detailed her efforts in teaching, research and service. In teaching, she stated that she had concentrated on active involvement by students through problem solving, the use of microscale experiments and incorporating a writing element into all of her chemistry classes. In research, the plaintiff stated that she had focused on three main areas: chiral molecules, ionophores and surfactants. Her chiral molecule research had yielded a paper that she successfully submitted for publication to the Journal of Organic Chemistry, the most prestigious publication in her field, and the plaintiff was in the process of coauthoring a textbook and laboratory manual. Finally, in service, the plaintiff stated that she was serving on several committees and supervising the use of new chemistry equipment. These activities were reviewed by outside professors and their response was positive. At the end

of the review, the appointments and promotions committee recommended that the plaintiff be reappointed.

The faculty manual provides that, "[a]t the first two reappointments, but especially at the second of these, particular attention is given to a candidate's prospects for tenure, and the Committee shall indicate as clearly as possible those areas to which a candidate needs to address special attention before the next scheduled review." At the time of the plaintiff's second reappointment, the appointments and promotions committee made three comments on the plaintiff's prospects for tenure. First, the committee noted that it appreciated the production of the textbook and laboratory manual but characterized its value as "pedagogical." Second, the committee made the following suggestion: "[W]e believe that [the plaintiff] should devote her scholarly energies to original research projects and, specifically, to the publication of the results of research conducted in her laboratory at [the defendant college]." Third, the committee stated that it would need clear evidence of the plaintiff's teaching effectiveness at the time that she was reviewed for tenure. The committee concluded that, "[o]utside of those specific recommendations, the Committee urges [the plaintiff] to continue along the lines she has so far established during her years at [the defendant college]." The appointments and promotions committee did not make any reference to the number of articles that the plaintiff had published, nor did it specifically mandate that she achieve final publication of additional articles before tenure review.

Under the faculty manual, review for tenure occurs no later than in the sixth year of the tenure track and, if favorable, results in promotion to associate professor and a lifetime appointment to the defendant's faculty. The process is the same as for reappointment, and the appointments and promotions committee applies the following standards. The candidate should have

achieved full teaching effectiveness in a wide range of courses and in advising and supervising students. The candidate's research should have "progressed beyond the stage of promise and should have achieved its promise of fruition" and should have been publicly demonstrated and recognized. Finally, the candidate's service and contribution to campus life should be demonstrable. "[A] negative [tenure] decision must be based on failure to meet the standards of improvement derived from expectations for rank and specified in the last letter of reappointment."

The plaintiff began review for tenure in the fall of 1992, her sixth year with the defendant. She presented her case for tenure in a thirty-six page candidate's statement detailing her efforts while employed there. In teaching, the plaintiff described her continuing focus on active participation by her students in classroom experiments and exercises, her supervision of student research and her interest in developing new classes. With respect to her research, she listed as completed research projects chiral molecules, the subject of her article in the Journal of Organic Chemistry, ionophores, a project she dropped for lack of results, and coauthorship of the laboratory manual. The plaintiff described two new projects that had grown out of her chiral molecules project as current research underway at the time of her review for tenure. The plaintiff also described three additional areas where she had done some research and planned to work in the future. The plaintiff wrote that one project, on sulfenate ester, "is just now yielding publishable results." The plaintiff also listed the next edition of her laboratory manual as future "chemical education" research. Finally, the plaintiff identified her work on committees at the defendant college as demonstration of her service to the school.

In her candidate's statement, the plaintiff also addressed what she perceived to be a weakness in her

candidacy. "One more aspect of my research deserves comment. Although several articles on which I am a coauthor have appeared in refereed journals since my arrival at [the defendant college], the only publication based on research conducted here since my arrival is the book, Organic Chemistry, A Short Course—Organic Laboratory Manual. Also, an article has been accepted by the Journal of Organic Chemistry, pending revision." The plaintiff stated that there were two main reasons for the "paucity of published articles." First, the plaintiff claimed that she had devoted considerable time and energy to teaching, including teaching a new set of courses each of her two first years at the school and being involved in curricular revision. Second, she claimed that, despite doing research throughout her time with the defendant, the sulfenate ester project was just beginning to yield publishable results and the ionophore project had not yielded publishable results before she decided to abandon it. Outside review of the plaintiff's candidacy for tenure was positive.

In March, 1993, the appointments and promotions committee voted not to recommend the plaintiff for tenure. The committee recognized the difficult teaching burden that the plaintiff had undertaken in her first years with the defendant, particularly her laboratories, student research supervision and introducing writing into her classes. The committee wrote, however, that the plaintiff was "a good teacher but not an extraordinary one." The committee also found the plaintiff's service to the school to be adequate. The plaintiff fell short, however, in the area of research and scholarship. The appointments and promotions committee stated, "[a]t the time of [the plaintiff's] review for second reappointment, the Committee wrote that it was important for [her] to publish work that came out of her laboratory at [the defendant college]. However, by the time of her tenure review, [the plaintiff] has only one published

article in a refereed professional journal." Moreover, the committee continued to disagree with the plaintiff's characterization of her textbook and laboratory manual revisions as scholarly because "this is not a textbook original with [the plaintiff]." The committee concluded that the plaintiff's scholarly work had "not 'progressed beyond the stage of promise' nor 'achieved its promise of fruition.'"

The plaintiff appealed to the appointments and promotions committee appeals board, supported by the chemistry department, and the appeals board recommended that the appointments and promotions committee reconsider its evaluation of the plaintiff. The appeal was based on the "fundamental unfairness" of the decision not to recommend her for tenure, one of the grounds for appeal set out in the faculty manual. The appointments and promotions committee reconsidered the plaintiff's candidacy and again decided not to recommend her for tenure.

The plaintiff filed her action in January, 1997, claiming that she was the subject of age and gender discrimination in violation of state and federal antidiscrimination laws; that the defendant had breached its employment contract with her; that it negligently had misrepresented the criteria she needed to meet in order to earn tenure; and that it negligently had inflicted emotional distress on her. The jury returned a verdict for the plaintiff on all claims but the age discrimination claim and found damages of $12,671,304. At the close of the trial, the defendant moved for judgment notwithstanding the verdict, or in the alternative to have the court set aside the verdict, for statutory reduction of the award, for remittitur and for a new trial. The trial court granted the motion for judgment notwithstanding the verdict only as to the claim of negligent infliction of emotional distress, denied the motion to set aside the verdict and denied the motion for a new

trial. The trial court granted in part and denied in part the motions for statutory reduction of the award and the motion for remittitur and rendered judgment for the plaintiff, assessing damages of $3,021,304.[4]

The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

I

DEFENDANT'S MOTION FOR JUDGMENT
NOTWITHSTANDING THE VERDICT

The defendant first claims that the trial court improperly denied its motion for judgment notwithstanding the verdict because there was insufficient evidence from which the jury could have concluded that: the plaintiff was discriminated against because of her sex; the defendant breached the parties' contract; and the defendant negligently misrepresented the criteria that would be used to review the plaintiff for tenure. We agree with regard to the claim of sex discrimination and disagree with the defendant's claims with regard to the breach of contract and negligent misrepresentation.

Appellate review of a trial court's refusal to render judgment notwithstanding the verdict occurs within carefully defined parameters. We must consider the evidence, and all inferences that may be drawn from the evidence, in a light most favorable to the party that was successful at trial. *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 667, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986). This standard

---

[4] Specifically, the trial court awarded $200,512 in past economic damages and increased tax liability, $470,792 in future economic damages and increased tax liability, $300,000 in punitive damages on the sex discrimination claim, and $2,050,000 in noneconomic damages on the sex discrimination claim.

of review extends deference to the judgment of the judge and the jury who were present to evaluate witnesses and testimony. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 17, 734 A.2d 85 (1999). Judgment notwithstanding the verdict should be granted only if we find that the jurors could not reasonably and legally have reached the conclusion that they did reach. Id. If the jury, however, without conjecture could not have found established an element of the claim, the verdict on the claim cannot withstand a motion for judgment notwithstanding the verdict. *Boehm* v. *Kish*, 201 Conn. 385, 389, 517 A.2d 624 (1986). Consequently, the plaintiff must produce sufficient evidence to remove the jury's function from the realm of speculation. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 18.

A

Sex Discrimination

We first address the defendant's claim that there was insufficient evidence for the jury to have found that the plaintiff was denied tenure because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (Title VII), and § 46a-60.[5]

The plaintiff concedes that the defendant's tenure review process is neutral on its face and does not violate antidiscrimination laws. She claims, however, that the process was applied to her differently because she is female. When a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.

---

[5] The defendant also claims that certain evidence in support of this claim, specifically comparison evidence, was improperly admitted. Because this claim is inextricably intertwined with the defendant's sufficiency claims, we address them together.

2d 668 (1973).[6] Under this analysis, the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias. Id., 802–804.

This methodology is intended to provide guidance to fact finders who are faced with the difficult task of determining intent in complicated discrimination cases. It must not, however, cloud the fact that it is the plaintiff's ultimate burden to prove that the defendant intentionally discriminated against her because of her sex. See *St. Mary's Honor Center* v. *Hicks*, 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("the factfinder must believe the plaintiff's explanation of intentional discrimination"); *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) ("[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff"); *Bickerstaff* v. *Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) ("the ultimate burden of persuasion remains always with the plaintiff"); *Fisher* v. *Vassar College*, 70 F.3d 1420, 1433 (2d Cir. 1995) (plaintiff has to prove by preponderance of evidence that employer had illegal discriminatory motive for employment decision). In the present case, we conclude that the plaintiff established a prima facie case of discrimination but failed to carry her ultimate burden of proving that the denial of tenure was motivated by illegal sex discrimination.

[6] We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both. *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 469–70, 559 A.2d 1120 (1989).

Employing the *McDonnell Douglas Corp.* framework, we must first consider the plaintiff's prima facie case of illegal sex discrimination. The establishment of a prima facie case creates a rebuttable presumption of discriminatory intent. *Lieberman* v. *Gant*, 630 F.2d 60, 63 (2d Cir. 1980). As the Court of Appeals for the Second Circuit has indicated, there are four elements to a prima facie case where the aggrieved party is alleging illegal denial of tenure: (1) that she belongs to a protected class; (2) that she was qualified for tenure; (3) that, despite her qualifications, she was denied tenure; and (4) that the denial took place under circumstances permitting an inference of discrimination. *Zahorik* v. *Cornell University*, 729 F.2d 85, 92 (2d Cir. 1984). The burden of establishing a prima facie case is a burden of production, not a burden of proof, and therefore involves no credibility assessment by the fact finder. *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor. *Fisher* v. *Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997).

There is no dispute that the plaintiff established the first three elements of a prima facie case of discrimination because (1) she is a female, (2) she was no less than minimally qualified for tenure,[7] and (3) she was denied tenure despite her qualifications. With respect to the fourth element of a prima facie case of discrimina-

---

[7] In the context of a tenure case, the "qualified" element of a prima facie case means "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." *Zahorik* v. *Cornell University*, supra, 729 F.2d 93–94; see also *Jalal* v. *Columbia University*, 4 F. Sup. 2d 224, 233 (S.D.N.Y. 1998). All five of the outside referrants in the plaintiff's file recommended her for tenure. Also, the tenured faculty in her department voted to recommend her for tenure initially and then supported her appeal with a lengthy memorandum. Thus, the plaintiff met the minimum level of proof that she was "qualified."

tion, that is, that the denial of tenure occurred in "circumstances permitting an inference of discrimination"; *Zahorik* v. *Cornell University*, supra, 729 F.2d 92; the plaintiff relies on the following evidence: (1) a breach by the defendant of the employment contract between the parties and inconsistent application of tenure review standards to the plaintiff and Professors Jack Chatfield and Paula Russo;[8] (2) statements by Professor Miller Brown that the plaintiff argues reveal bias in the tenure process; and (3) a reference to Chatfield as "old boy Jack."

The most typical method used by plaintiffs to establish the fourth prong of a prima facie case is to introduce evidence that the defendant later considered, hired, granted tenure to, or promoted comparably qualified individuals not in a protected class of individuals.[9] See *Zimmermann* v. *Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (plaintiff's replacement by someone outside protected class satisfied fourth element of prima facie case); *Schnabel* v. *Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (replacement of sixty plus year old plaintiff by thirty-one year old permitted inference of age discrimination); *Carlton* v. *Mystic Transportation, Inc.*, 202 F.3d 129, 135–36 (2d Cir. 2000) (plaintiff's replacement by two employees eighteen and twenty-five years younger permitted inference of age discrimination); *Norville* v. *Staten Island University*

[8] The defendant also argues on appeal that it is entitled to a new trial because the trial court improperly admitted this comparison evidence. We do not agree with this claim and discuss it later in this opinion. The essence of our holding on the evidentiary claim is that the evidence should be admitted to demonstrate a difference in process, which the plaintiff claimed was its purpose.

[9] In the original *McDonnell Douglas Corp.* framework, the fourth element of a prima facie case was that, after the employer rejected the applicant, "the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications." *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802. Courts have since adopted the more general fourth element above.

*Hospital,* 196 F.3d 89, 96 (2d Cir. 1999) (plaintiff's age discrimination claim based on employer's decision to fill position with younger candidate). This highly probative evidence, however, is not always available in tenure denial cases because decisions to grant tenure, unlike typical hiring decisions, are made on a rolling basis and do not involve a search to fill a particular position. Furthermore, there can be years between tenure candidacies in some departments. Compounding the difficulty is that tenure is extremely department specific. Therefore, comparison between different departments is not helpful. *Zahorik* v. *Cornell University,* supra, 729 F.2d 93 (denial of tenure in one department cannot be compared to grant of tenure in another department).

Nevertheless, where such evidence of later candidates is available in tenure cases, it is persuasive in proving a prima facie case. See id., 94–95 (plaintiffs introduced evidence males were later granted tenure in departments of three of four plaintiffs); *Lieberman* v. *Gant,* supra, 630 F.2d 63 (female plaintiff met fourth prong of prima facie case by showing males were later granted tenure in department that had denied her tenure); *Kunda* v. *Muhlenberg College,* 621 F.2d 532, 538–39 (3d Cir. 1980) (plaintiff met "qualified" element of prima facie case despite lacking master's degree, which was required by school, because she demonstrated that three males in her department were promoted without master's degree).[10]

We recognize that the plaintiff in the present case has not produced any evidence of similarly qualified males being granted tenure or considered for tenure in the defendant's chemistry department either before or after her unsuccessful candidacy. Nothing in *McDonnell*

---

[10] In fact, evidence of later candidates is so prevalent that some courts have applied the fourth element of *McDonnell Douglas Corp.* in tenure cases despite the inherent difficulties of doing so. See *Lieberman* v. *Gant,* supra, 630 F.2d 63.

*Douglas Corp.* or *Zahorik*, however, limits the type of circumstantial evidence that may be used to establish the fourth prong of the test for a prima facie case of sex discrimination. For example, a number of courts have concluded that proof of procedural irregularities in the tenure process may permit an inference of discrimination. See *Weinstock* v. *Columbia University*, 224 F.3d 33, 45 (2d Cir. 2000) (committee chair's unusual calls to committee members and provost's delay in explaining negative committee recommendation procedural irregularities considered by court but ultimately deemed not evidence of discrimination); *Bickerstaff* v. *Vassar College*, supra, 196 F.3d 453–54 (examining whether appointment of two committees revealed discriminatory intent); *Norville* v. *Staten Island University Hospital*, supra, 196 F.3d 97 (plaintiff established fourth element of prima facie claim by showing employer deviated from standard practice of promoting most senior candidate); *Stern* v. *Trustees of Columbia University*, 131 F.3d 305, 313 (2d Cir. 1997) (" 'unusual rapidity' " procedural irregularity in selection process considered under fourth prong of prima facie case test); *Zahorik* v. *Cornell University*, supra, 729 F.2d 93 ("[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process"); *Kunda* v. *Muhlenberg College*, supra, 621 F.2d 536–38 (considering evidence that plaintiff was not told why she was denied promotion, that she was not counseled how to increase her chance of promotion despite college's practice of doing so, that dean did not forward her file to review committee with other candidates' files, and that dean argued against her promotion before review committee when he normally did not attend meetings in which tenure candidates were discussed); *Powell* v. *Syracuse University*, 580 F.2d 1150, 1155 (2d Cir. 1978) (considering evidence that plaintiff was never informed

about criticism of her work that arose during reappointment so she was unable to address it before tenure review).[11]

There are differences, however, between these cases and the present case. The procedural irregularities in the cited cases constitute deviations from the simple mechanics of tenure review and the rules that institutions create to govern their decision-making process. Presumably, they can be probative of a defendant's intent because such rules are relatively clear and easy to follow, making deviations from them hard to explain except by a lack of good faith.

The present case, on the other hand, involves a relatively close call on the interpretation of contract language, not the failure to follow the simple procedural rules governing tenure review such as the composition of a committee, failure to collect all of the evidence or neglecting to forward the plaintiff's file in a timely manner. Specifically, the plaintiff claims, and we agree for reasons set forth in part I B of this opinion, that she was not adequately warned that she was in danger of being denied tenure and that the defendant did not provide specific enough guidance on the areas she needed to improve in order to earn tenure. As a result, the plaintiff asserts, the defendant indicated that her scholarship was to be measured by one standard, but it was eventually measured according to a different one. Nevertheless, the breach of contract in this case was improper conduct and was directly related to the tenure decision. Accordingly, we conclude that the plaintiff has established the existence of circumstances permitting an inference of discrimination and thereby has

[11] In order for the procedural irregularity to be probative of the presence of actual discrimination, the plaintiff must also be able to show that the irregularity had a tangible effect on the tenure review process. See *Zahorik* v. *Cornell University*, supra, 729 F.2d 93, 94.

satisfied the de minimis requirement for a prima facie case.

Under the *McDonnell Douglas Corp.* burden-shifting analysis, establishing a prima facie case of discrimination creates a presumption that the defendant acted illegally. *Texas Dept. of Community Affairs* v. *Burdine*, supra, 450 U.S. 254. "To establish a 'presumption' is to say that a finding of the predicate fact (here, the prima facie case) produces 'a required conclusion in the absence of explanation' . . . ." *St. Mary's Honor Center* v. *Hicks*, supra, 509 U.S. 506. To rebut this presumption, the defendant must only articulate a legitimate, nondiscriminatory reason for denying the plaintiff tenure. *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802–803. This, too, is a burden of production, and the defendant merely needs to state a nondiscriminatory reason. The defendant does not have to prove the absence of discrimination. *Board of Trustees* v. *Sweeney*, 439 U.S. 24, 25, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978). The defendant in the present case presented evidence that the decision not to grant tenure to the plaintiff was based on a research and publication record that, in the defendant's opinion, had not come to fruition and achieved its early promise, thus falling short of the standard for tenure set forth in the faculty manual. To rebut the plaintiff's prima facie case, the defendant "do[es] not have the burden of establishing that [the] basis was sound." *Lieberman* v. *Gant*, supra, 630 F.2d 65. Simply stating a basis for the decision other than the plaintiff's sex was enough.[12]

Once a defendant has stated a legitimate, nondiscriminatory reason for its employment decision, "the

---

[12] We recognize the unusual nature of finding that the reason offered by the defendant for denying tenure to the plaintiff, that her scholarship did not meet the standards required by the defendant, constituted both evidence of a breach of contract and a legitimate, nondiscriminatory reason for the defendant's decision. Nevertheless, a stated reason for an employment decision that constitutes a breach of contract may be nondiscriminatory.

*McDonnell Douglas* framework—with its presumptions and burdens—disappear[s] . . . and the sole remaining issue" is whether the defendant engaged in illegal discrimination. (Citation omitted; internal quotation marks omitted.) *Reeves* v. *Sanderson Plumbing Products, Inc.*, supra, 530 U.S. 142–43. To prove discrimination, the plaintiff must prove that the defendant's stated nondiscriminatory reason for its decision was in fact a pretext for an unlawful motive. Id., 143. A plaintiff must be allowed the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs* v. *Burdine*, supra, 450 U.S. 253. Although the presumption created by the prima facie case disappears, the plaintiff may rely upon the evidence used in establishing the prima facie case to prove the ultimate issue of sex discrimination. Id., 255 n.10.

As we have noted, the plaintiff offers the following evidence that the defendant's denial of tenure was motivated by discrimination: (1) the defendant's breach of contract and inconsistent application of tenure review standards between the plaintiff and Chatfield and Russo; (2) statements by Brown that the plaintiff argues reveal bias in the tenure process; and (3) a reference to Chatfield as "old boy Jack." In order to prevail, a fact finder must conclude that this evidence gives rise to the inference of actual discrimination in the hiring process, not merely speculation of discrimination. *Bickerstaff* v. *Vassar College*, supra, 196 F.3d 448. We conclude that this evidence is not sufficient to allow a jury reasonably and legally to have concluded that tenure was denied to the plaintiff because of her sex. In other words, we conclude that the evidence was insufficient to permit a finding of sex discrimination unless the jury engaged in speculation.

The United States Supreme Court recently considered "whether a plaintiff's prima facie case of discrimination . . . combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." (Citation omitted.) *Reeves* v. *Sanderson Plumbing Products, Inc.*, supra, 530 U.S. 140. In *Reeves*, the Fifth Circuit Court of Appeals had held that a plaintiff who proves a prima facie case and introduces enough evidence for a jury to find pretext must also always introduce additional, independent evidence of discrimination or the defendant will be entitled to judgment as a matter of law. Id., 149. The Supreme Court rejected that conclusion, holding that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id., 147. The court specifically noted, however, that a "factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff." (Emphasis in original.) Id., 146, citing *St. Mary's Honor Center* v. *Hicks*, supra, 509 U.S. 511. The court concluded that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves* v. *Sanderson Plumbing Products, Inc.*, supra, 148. The factors to be weighed when considering whether judgment as a matter of law will be appropriate in such cases are "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false"; id., 148–49; and any other relevant evidence.[13] Id., 149. Considering these

---

[13] We note that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the

factors, we conclude that the plaintiff failed to adduce sufficient evidence to prove discrimination even though the plaintiff satisfied the requirements of a prima facie case.

First, although the plaintiff satisfied the de minimis requirement for a prima facie case, she did not present evidence particularly probative of discrimination when doing so. The plaintiff's prima facie case, namely, the defendant's breach of contract, was consistent with circumstances under which discrimination could have taken place, but she did not provide any evidence that discrimination actually motivated the breach.

Second, with respect to the plaintiff's claim that the defendant's reasons for denying her tenure were pre-textual, we note that the issue of pretext is a particularly thorny one in an academic setting. A court must be careful not to substitute its judgment improperly for the academic judgment of the school. "A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom." (Internal quotation marks omitted.) *Lieberman* v. *Gant*, supra, 630 F.2d 67, quoting *Sweezy* v. *New Hampshire*, 354 U.S. 234, 263, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957). This academic freedom is rooted in the first amendment. *Villanueva* v. *Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991). First amendment protection of academic freedom prevents courts from substituting their judgment for the judgment of the school. In other words, courts should not become " 'Super-Tenure Review Committee[s]'." *Lieberman* v. *Gant*, supra, 67, quoting *Keddie* v. *Pennsylvania State University*, 412 F. Sup. 1264, 1270 (M.D. Pa. 1976). Nevertheless, deference to the judgment of academia

extent that that evidence comes from disinterested witnesses." (Citation omitted; internal quotation marks omitted.) *Reeves* v. *Sanderson Plumbing Products, Inc.*, supra, 530 U.S. 151.

cannot result in abdication of the judiciary's responsibility to find and redress discrimination. *Powell* v. *Syracuse University*, supra, 580 F.2d 1154. The principle of academic freedom protects institutions from infringement of their first amendment rights by preventing courts from substituting their own evaluations of obscure and abstract scholarship for an honest but negative evaluation by a school, but it does not insulate institutions from redress for legitimate claims.

The plaintiff claims that her department and outside reviewers unanimously supported her candidacy, while the defendant, acting through its appointments and promotions committee, had the only negative evaluation of her scholarship. According to the plaintiff, those facts together show that the evaluation was pretextual. But in order to be successful, a plaintiff must "show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university. Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities." *Zahorik* v. *Cornell University*, supra, 729 F.2d 94. A fact finder may not substitute its evaluation of the candidate's qualifications and recommendations for the defendant's standard for tenure. The first amendment guarantees that the defendant may pass its own judgment on the plaintiff's scholarship and accept or reject other evaluations in the process. Accordingly, we conclude that the plaintiff's evidence pertaining to differing evaluations of her performance did not establish pretext.

We now consider whether there is any evidence indicating that the denial of tenure was actually motivated by discrimination. The plaintiff relies most heavily on the comparison between her candidacy and the candidacies of Chatfield and Russo. This claim requires us to consider the role of evidence comparing successful and unsuccessful tenure candidates in cases where discrimination is alleged to have motivated the tenure denial. Specifically, we must determine whether a fact finder's consideration of comparison evidence in connection with a claim of discrimination in the tenure review process improperly subjects a school to second-guessing of its evaluation of a tenure candidate, an impermissible infringement of a school's first amendment academic freedom.

We first note that it would be an illogical leap to conclude that evidence that a female or minority candidate was denied tenure despite being minimally qualified indicates, in and of itself, that denial was motivated by discrimination. A multitude of factors go into a tenure decision including the quality of a candidate's work, the departmental need for a specialist, the number of tenure positions available, the mix of well known scholars and up-and-coming faculty, the collegiality of the candidate, and the quality of relations with peers and the administration. Id., 92–93. The principle of academic freedom does not provide colleges and universities with immunity from claims of discrimination, but it does require courts to keep sharply focused on whether denial of tenure was actually motivated by discrimination and not by one of the many other possible reasons that a candidate was unsuccessful.

The principle of academic deference guides our view of comparison evidence because the principle that a school may choose its own faculty for any nondiscriminatory reason is never more in jeopardy than when a plaintiff puts before a jury evidence that two individuals

with similar credentials were considered for tenure, and one was denied it. Evidence of an apparently arbitrary tenure decision may violate a jury's fundamental sense of fairness. Nevertheless, it is clear that "Title VII does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory. . . . Indeed, to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values." *Lieberman* v. *Gant*, supra, 630 F.2d 67. Comparison evidence tempts fact finders to provide redress to candidates who seem to deserve tenure and whose denial is not easily or honestly explained, even where there is no evidence that the denial was motivated by discrimination.

Courts, therefore, should not engage in direct comparison of different candidate files "in the absence of independent evidence of discriminatory intent or a claim that [a female] plaintiff's qualifications were clearly and demonstrably superior to those of the successful males . . . ." Id., 68; see also *Jalal* v. *Columbia University*, 4 F. Sup. 2d 224, 241 (S.D.N.Y. 1998) (excluding comparison evidence of academic credentials because plaintiff's qualifications were not clearly and demonstrably superior to those of other candidates). In the present case, the plaintiff has characterized the credentials of Chatfield and Russo as similar to her own and not as "clearly and demonstrably" inferior, and there is no independent evidence of discriminatory bias. We also note the facts that Chatfield teaches in the history department and Russo in the math department, which preclude direct comparison of their tenure files. As noted by the Second Circuit Court of Appeals, "[a] denial of tenure by an English department simply cannot be compared with a grant of tenure in the phys-

ics or history departments." *Zahorik* v. *Cornell University*, supra, 729 F.2d 93.

The plaintiff's presentation of all three candidacies is laced with direct comparisons between her own publication record and those of Chatfield and Russo. To compare these publication records would require an inadmissible substantive comparison between the candidates and an improper intrusion into the right of the defendant to decide for itself which candidates satisfied its publication requirements. In the absence of any independent evidence of discrimination, evidence that an academic institution appears to have been more critical of one candidate than of another is not sufficient to raise an inference of discrimination. See *Jalal* v. *Columbia University*, supra, 4 F. Sup. 2d 241 (rejecting plaintiff's argument that she was subject to "stricter" standard because review would have been improper intrusion into school's academic judgment). Accordingly, we conclude that the plaintiff's comparison evidence was not properly admissible to show that she was more qualified than candidates who received tenure.

The plaintiff claims, however, that the comparison evidence was offered to demonstrate inconsistent application of the procedures for tenure review. She asserts that a comparison of the tenure review procedures applied to her, Chatfield and Russo shows that she was discriminated against because the standard applied to her at her second reappointment did not clearly state what she was expected to have accomplished by the time of her tenure review in order to earn tenure. Specifically, she claims that she was advised that she would be evaluated on whether she "devote[d] her scholarly energies" to original research and publication, which is a standard of effort and quality. The plaintiff was reviewed, however, primarily on the quantity of publications she produced. Although we agree, as set forth more fully in part I B of this opinion, that this conduct

by the defendant was a breach of contract, it does not give rise to the inference of discrimination. Rather, the evidence shows only that Chatfield, a man, and Russo, a woman, were not subject to a shifting standard.[14] There can be no logical inference that the motivation for the shifting standard was the plaintiff's sex where it distinguished her review from the reviews of males and females alike.

The plaintiff also claims that evidence of bias by individuals involved in the tenure process also may be introduced by plaintiffs in tenure discrimination cases. We note, however, that courts have been unwilling to accept any comments relating to race or gender as proof of discrimination unless there is evidence that the comments reflect bias that actually infected the tenure process. See *Bickerstaff* v. *Vassar College*, supra, 196 F.3d 450–58 (holding: [1] review committee member's criticism of Africana Studies Department did not indicate racial bias against black professor seeking tenure; [2] affidavits of two Vassar professors stating plaintiff was denied tenure because of race were conclusory opinions and not evidence; [3] study that teacher evaluations were generally lower for black professors was not proof that plaintiff's low evaluations were motivated by race; [4] statement that "[w]e can ill afford to tenure as associate professor yet another black faculty member who

---

[14] The letter from the appointments and promotions committee concerning Russo's second reappointment warned that the committee, "expect[ed] to see, by the time of the tenure review, the publication of materials based on work done at [the defendant college]." Russo was then granted tenure because the appointments and promotions committee decided that she had met that standard. Chatfield was warned that "a good deal more scholarly production is necessary to support a case for tenure two years hence." The appointments and promotions committee also recommended that the chair of the history department "work with Professor Chatfield in planning a realistic and practicable set of scholarly projects that will be academically substantial and will also reflect his own strongest intellectual interests." Chatfield was granted tenure because the defendant determined that he had met this standard.

seems destined to be stuck in that rank forever" by chair of plaintiff's review committee when recommending against tenure for another candidate was predictive and not evidence of bias); *Zahorik* v. *Cornell University,* supra, 729 F.2d 94 (holding statement that plaintiff was "too feminine" was not evidence of discrimination because author was describing effect of plaintiff's personality on graduate students); *Jalal* v. *Columbia University,* supra, 4 F. Sup. 2d 236–41 (dismissing Pakistani plaintiff's claim of discrimination on summary judgment despite facts that: [1] Indian chairwoman of tenure review committee asked Indian graduate student working for plaintiff how it felt to work for Pakistani; [2] Indian chairwoman stated, " 'I have heard that [the plaintiff] holds and expresses distinctly anti-Indian views' "; [3] Indian chairwoman spoke in deposition of being passed over for promotion by less qualified, Muslim male; [4] Indian husband of Indian chairwoman, member of committee that appointed tenure review committee, stated, " 'you can't expect a Pakistani to teach the history of India' "; [5] member of tenure review committee compared the Pakistani plaintiff's scholarship on India to " 'White' Russian" studying Soviet history or "Vermont historian" being in favor of confederacy).

The plaintiff offers two pieces of evidence that she argues demonstrate bias by the appointments and promotions committee. First, the plaintiff cites statements made by Brown, a member of the appointments and promotions committee, when Brown was explaining the plaintiff's microscale experiments at trial. To explain his view that developing microscale experiments was not original research, Brown analogized the experiments to a "cookie recipe." "These are recipes. To do an experiment in a laboratory for students is to do a recipe, to follow an experimental protocol to come up with a result which is well known. . . . If you want

to reduce a recipe from one size to another, you may have some problems. If you have a recipe for two dozen cookies and you want to reduce that recipe to one cookie, what do you do? If the recipe for two dozen cookies calls for one egg, how are you going to reduce the number of eggs in order to make one cookie? . . . You're not trying to find out how to make new cookies; you're trying to find out how to specify a procedure for somebody to use to make one cookie." The plaintiff argues that this "stereotypical denigration of [her] work was an insult which reflected a state of mind he held in 1993, one which inappropriately incorporated gender into employment decisions."

We are not persuaded by the plaintiff's characterization of this analogy and do not think it gives rise to the inference of discrimination in the plaintiff's tenure review for two reasons. First, this analogy was developed as part of the defendant's trial strategy six years after the tenure decision. Second, it is simply too attenuated to conclude that Brown's reference to cookie making reflected a stereotypical and pejorative view of women chemists. Indeed, the plaintiff herself referred to some experiments done by chemistry students as "cookbook" style experiments, indicating that thinking of chemistry in terms of cooking was neither unique to men nor denigrating to women.

The second piece of evidence that the plaintiff relies upon to prove that she was denied tenure because of her sex is the phrase "old boy Jack." The phrase was used by history professor H. McKim Steele, Jr., in a letter to the chair of the history department describing how he thought the faculty would perceive tenure being granted to Chatfield, who was a fixture in the community but, in Steele's opinion, did not meet the standard of scholarship required for tenure at the defendant college. This statement was not a reflection of the process or deliberations that actually took place on the appoint-

ments and promotions committee, nor was it intended to be, because Steele had not served on the committee since the 1970s. If anything, the statement could be read to mean that the faculty objected to the granting of tenure to "old boys." Because this statement is only Steele's prediction of the faculty's perception of Chatfield's tenure, and not a justification for granting tenure, we conclude that it raises no inference of discrimination and that the plaintiff's reliance on it is misplaced.

We conclude that, under *Reeves*, there is insufficient evidence to support a finding of discrimination in the plaintiff's tenure review. Accordingly, we reverse the trial court's decision denying the defendant's motion for judgment notwithstanding the verdict on the plaintiff's claim of sex discrimination.

B

Breach of Contract

The defendant also claims that the trial court improperly denied its motion for judgment notwithstanding the verdict on the plaintiff's claim that the defendant breached the parties' employment contract. We disagree with the defendant and affirm the judgment of the trial court.

Before we begin our analysis of the breach of contract claim, we first address the defendant's assertion that courts and juries should not second-guess tenure decisions even when considering breach of contract claims. We note that a "[u]niversity cannot claim the benefit of the contract it drafts but be spared the inquiries designed to hold the institution to its bargain." *Kyriakopoulos* v. *George Washington University*, 866 F.2d 438, 447 (D.C. Cir. 1989). The principle of academic freedom does not preclude us from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract. Cf. id. ("This case

does not involve a judicial recalculation of the University's evaluation of a professor's scholarly merit. The factfinder's scrutiny need extend only far enough to ensure that the University perform its contractual duty . . . ."); *McConnell* v. *Howard University*, 818 F.2d 58, 65 (D.C. Cir. 1987) (holding that professor was improperly dismissed because university did not adhere to standards and procedures required by faculty manual for such action); *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 581, 687 A.2d 111 (1996) (distinguishing between employment terms of residency agreement and educational terms and holding that resident could be dismissed because decision was academic evaluation of resident's performance); *Sentner* v. *Board of Trustees*, 184 Conn. 339, 347, 439 A.2d 1033 (1981) (holding that professor earned tenure where contract automatically granted tenure after six years of service and professor had completed six years and was appointed for seventh); *Daley* v. *Wesleyan University*, 63 Conn. App. 119, 132, 772 A.2d 725, cert. denied, 256 Conn. 930, 776 A.2d 1145 (2001) (holding that tenure is academic judgment and relief can be granted only if denial was arbitrary, capricious or in bad faith and therefore breach of parties' contract). In the present case, we conclude that the evidence supports the conclusion that the defendant breached the parties' contract by indicating that the plaintiff would be evaluated according to one standard but denying tenure because of her failure to meet a different one.

A faculty manual that sets forth terms of employment may be considered a binding employment contract. *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 564, 479 A.2d 781 (1984) ("[s]ometimes the promise has been found in the representations contained in an employee relations manual or handbook"); see *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 532, 733 A.2d 197 (1999) (same). Interpretation of the written

terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the jury. *Gaudio* v. *Griffin Health Services Corp.*, supra, 533 ("the trial court correctly submitted to the jury the task of determining the contours of the parties' intentions").

There are three specific provisions that the plaintiff claims the defendant breached when it denied her tenure. First, the faculty manual provides that, at the second reappointment, "particular attention is given to a candidate's prospects for tenure, and the [Apppointments and Promotions] Committee shall indicate as clearly as possible those areas to which a candidate needs to address special attention before the next scheduled review." Second, "a negative decision must be based on failure to meet the standards of improvement derived from expectations for rank and specified in the last letter of reappointment." Third, the defendant's affirmative action policy encourages the hiring and promotion of formerly excluded and previously underutilized groups: "the candidate's scholarly activities, particularly when these are in new or non-traditional fields, must receive a fair and unbiased review." We conclude that the plaintiff presented sufficient evidence to support the jury's verdict on all three grounds.

In the plaintiff's second letter of reappointment, the appointments and promotions committee recommended, among other things, that "[the plaintiff] should devote her scholarly energies to original research projects and, specifically, to the publication of the results of research conducted in her laboratory at [the defendant college]." The letter concluded, "[o]utside of those specific recommendations, the [Appointments and Promotions] Committee urges [the plaintiff] to continue along the lines she has so far established during her years at [the defendant college]." Despite the faculty manual's directive to be as specific as possible and to pay particu-

lar attention to the candidate's prospects for tenure, the defendant was generally positive about the plaintiff's work and vague about her deficiencies. In an academic setting where research projects take place over the course of years, the warning signs, if there were any, that the plaintiff was not going to meet those standards should have been apparent to the defendant after four years of a six year tenure track. The defendant claims that there were such signs and points to the language of the second letter of reappointment as evidence that the plaintiff was given fair warning and that the defendant complied with the contract. The jury concluded that the warning was not specific enough, however, and we conclude that the evidence supports that determination. A reasonable jury could agree that the defendant's mildly worded suggestion that the plaintiff devote her scholarly energies to original research and publication of results, coupled with the urging "to continue along the lines she has so far established," did not comply with the contractual requirement to "indicate as clearly as possible those areas to which a candidate needs to address special attention before the next scheduled review," particularly when the plaintiff was in jeopardy of being denied tenure.

The faculty manual also provides that a negative decision by the defendant was to be "based on failure to meet the standards of improvement . . . specified in the last letter of reappointment." The plaintiff's second letter of reappointment suggested that she devote her scholarly energies to original research performed in her laboratory at the defendant college and to the publication of the results of her work there.[15] At the time the

---

[15] The letter also disagreed with the plaintiff's characterization of her work on a laboratory manual as original research, a position restated at the time the plaintiff was denied tenure. This position was maintained by the defendant throughout the plaintiff's reviews and is a valid academic judgment that the defendant is entitled to make under the principle of academic deference.

plaintiff was denied tenure, the defendant cited the publication of "only one published article in a refereed professional journal." The plaintiff claims that this evidence shows that the defendant changed the standards used to evaluate her at some point between her last reappointment and the time when she was denied tenure, thereby breaching the requirement that denial of tenure be based on a failure to improve in the areas suggested during the second reappointment.

The plaintiff introduced considerable evidence supporting this aspect of her breach of contract claim. The quantity of publication was emphasized during the tenure denial but was not clearly emphasized at any time prior thereto. The second letter of reappointment recommended only that the plaintiff "devote her scholarly energies" to research and publication—actual publication being the culmination of a long process.[16] The defendant therefore was required to consider the plaintiff's inability or unwillingness to devote her energies to the process of research and publication. The jury reasonably could have concluded that this standard required focused effort by the plaintiff but did not require that the research actually be published by the time she was to be reviewed for tenure. The defendant, however, justified its denial of tenure on the plaintiff's lack of final publications. Specifically, the appointments and promotions committee cited her completion of only one publication at the time she was reviewed.

Additional evidence of a shifting standard can be found in the letters from the defendant to the five out-

---

[16] The second letter from the appointments and promotions committee concerning Russo's second reappointment, for example, clearly demanded finished publications by the time she was reviewed for tenure: "[the appointments and promotions committee] will expect to see, by the time of the tenure review, the publication of materials based on work done at [the defendant college]." The letter concerning Chatfield's second reappointment demanded more "scholarly production," a standard he could meet without final publication.

side scholars asked to review the plaintiff's candidacy. They include the statement: "we would appreciate your focusing on the quality of [the plaintiff's] work more than on its quantity. Evidence of quality would appropriately include distinguished achievement through publication or performance, other such significant contributions to one's profession as the presentation of important scholarly papers or noteworthy participation in professional organizations, and professional recognition through influential scholarly interchange with colleagues." It would not be unreasonable for a jury to conclude that this statement is a reflection of the standard that was to be applied to the plaintiff. When the plaintiff was denied tenure, however, the appointments and promotions committee wrote that it was "attentive" to the argument that the plaintiff's article in the Journal of Organic Chemistry was a "major piece." In other words, the appointments and promotions committee recognized the quality of the article but focused on the fact that the plaintiff had "only one published article in a refereed professional journal"—a reference to quantity—in concluding "that [the plaintiff's] scholarly work has not 'progressed beyond the stage of promise' nor 'achieved its promise of fruition.'" A jury reasonably and logically could have concluded that this reflected a change in the standard the plaintiff had to meet in order to be granted tenure and therefore constituted a breach of the parties' employment contract.[17]

Finally, the plaintiff alleges that the defendant did not abide by its institutional affirmative action policy.

---

[17] The defendant argues that the plaintiff's statement, "[t]here is no more that I could have done," reveals a lack of causation between any breach by the defendant and the plaintiff's failure to earn tenure. This overlooks the fact that a clearer statement of expectations would have given the plaintiff more guidance for planning the last two years before her tenure review and would have given her a chance to redirect all of her effort to address directly the defendant's eventual concern with the quantity of her publications.

The policy requires that the defendant make efforts to hire and promote previously underutilized and excluded groups. It also requires that such a candidate's file must receive a fair and unbiased review particularly if his or her research and activities are in a new or nontraditional area. In support of her claim, the plaintiff introduced evidence that women are underrepresented in the hard sciences, such as chemistry. The plaintiff also introduced evidence that female professors may have a publishing style different from that of men, which incorporates fewer articles farther apart in time but more detailed research in each article. The plaintiff claims that this should have been incorporated into the defendant's decision-making process under the affirmative action policy. On the foregoing evidence, we agree that a jury reasonably could have concluded that the defendant was contractually required to consider the plaintiff's candidacy under the affirmative action policy and, in light of the evidence previously set forth, that it breached the parties' contract by not doing so.

For all of these reasons, we affirm the trial court's denial of the defendant's motion for judgment notwithstanding the verdict on the plaintiff's claim for breach of contract.

C

Negligent Misrepresentation

We now address the defendant's argument that a reasonable jury could not have found that the defendant made negligent misrepresentations in the second letter of reappointment. From our review of the letter, we hold that the jury had a sufficient evidentiary basis for its conclusion.

"[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.

. . . The governing principles are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Citations omitted; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 575, 657 A.2d 212 (1995).

In the second letter of reappointment, the defendant suggested that the plaintiff devote her scholarly energies to original research and publication and that she continue along the lines she was already on at the defendant college. At that time, the plaintiff was in the midst of publication of a major article, to which she devoted considerable time and energy before she was reviewed for tenure. Thereafter, the defendant denied tenure to the plaintiff because that one article was not enough to satisfy the scholarship requirements for tenure. Although we recognize that it was within the defendant's discretion to determine what was adequate to meet the scholarship requirement for tenure, we conclude that the jury reasonably could have found that the second letter of reappointment negligently misrepresented that as long as the plaintiff devoted her time and energy to the publication process, tenure would be forthcoming.

The defendant argues that the plaintiff failed to prove reliance on the misrepresentation because she said that she "did all that [she] could" between her second reappointment and tenure review. We reject this argument. The jury reasonably could have concluded that the plaintiff relied on the defendant's unclear statement of expectations and vague reference to her weaknesses,

along with the assurance that she should "continue along the lines" she already had established, to continue to revise and research her article for the Journal of Organic Chemistry instead of breaking it up into several smaller articles or bringing one of her other projects to final publication. Although the plaintiff might have worked as hard as she could to achieve tenure, the jury could have concluded that if the defendant had been more specific in its evaluation of the plaintiff's candidacy, she might have been able to allocate her time in a way to address more effectively the defendant's concerns.

## II

## DEFENDANT'S MOTION FOR A NEW TRIAL

In the alternative, the defendant argues that it is entitled to a new trial because the trial court improperly admitted comparison evidence and expert testimony and because the trial court failed to instruct the jury that it could not second-guess the defendant's tenure decision. We disagree for the reasons set forth in part I A of this opinion and affirm the judgment of the trial court.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided." *State* v. *Hammond*, 221 Conn. 264, 269, 604 A.2d 793 (1992).

The defendant argues that the jury instructions given by the trial court were inadequate in two ways and merit a new trial. "Failure to charge precisely as proposed by a defendant is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Citation

omitted.) *Tomczuk* v. *Alvarez*, 184 Conn. 182, 190, 439 A.2d 935 (1981).

The defendant's first argument is that the trial court should have given a charge that the jury could not substitute its academic judgment for that of the defendant when considering the plaintiff's contract claim. The defendant claims that the instruction given by the trial court improperly allowed the jury to determine whether the plaintiff met the standards required for tenure, thereby second-guessing the tenure decision. As we discussed previously in the breach of contract analysis, the thrust of the plaintiff's claim was that the defendant deviated from the faculty manual. The jury was specifically charged, "[i]t is your duty to consider whether or not [the defendant] breached its contract with the plaintiff by failing to follow the procedures relating to tenure set forth in the faculty manual fairly to her case." Thus, the jury properly was instructed to decide whether the defendant consistently applied the standards in the manual and the second letter of reappointment. It was not asked to determine whether the plaintiff met those standards.

The defendant relies upon *Gupta* v. *New Britain General Hospital,* supra, 239 Conn. 586, in support of its argument that the trial court should have given an academic judgment instruction on the contract claim. This reliance is misplaced. *Gupta* involved the dismissal of a medical resident for poor performance. This court used a "functional analysis" of the residency agreement to determine that its purpose was educational. In other words, the purpose of a residency and the residency agreement is to educate a medical student, albeit in the context of a job at a hospital. Dismissal for poor performance was therefore an educational decision, akin to giving a poor grade to a student in class. This academic decision deserves deference from the courts. In contrast, the relationship between the plaintiff and

the defendant in the present case is one of employer and employee. That the employment relationship is in an academic setting does not mean that the defendant has absolute discretion on its employment decisions. Our deference extends only as far as the employment decision is based on an academic judgment. The defendant is not given deference as to its interpretation of the standards for tenure review as set forth in the employment contract. Accordingly, we conclude that it was within the trial court's discretion not to issue the full charge requested by the defendant and that the instruction given by the court was sufficient to protect the defendant from second-guessing.

## III

## DEFENDANT'S MOTION TO SET ASIDE THE VERDICT

The defendant claims the trial court improperly awarded $2,050,000 in noneconomic damages under the state antidiscrimination law. Because we reverse the trial court's denial of the defendant's motion for judgment notwithstanding the verdict on the plaintiff's sex discrimination claim, we do not address this claim.

The judgment is reversed in part and the case is remanded with direction to grant the defendant's motion for judgment notwithstanding the verdict on the claim of sex discrimination and with direction to modify the judgment and award accordingly; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.