HARTFORD POLICE DEPARTMENT *v.*
COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES ET AL.
(SC 20669)
(SC 20674)

Robinson, C. J., and D'Auria, Mullins, Ecker and Alexander, Js.

*Syllabus*

The defendant P filed a complaint with the named defendant, the Commission on Human Rights and Opportunities, alleging that P's former employer, the plaintiff, the Hartford Police Department, had discriminated against P on the basis of his ancestry. Upon graduating from the

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

police academy, P, who is Vietnamese, began a probationary period of employment, which included a field training program and during which superior officers were required to complete daily observation reports evaluating his performance. P received a satisfactory rating upon completion of the field training program and then continued to receive generally satisfactory daily evaluations from his superior officers, including K, who previously had been disciplined for making discriminatory and/or racist remarks to other individuals. Subsequently, on two separate occasions, K made certain remarks to P about his grammar and writing skills, criticizing P's accent, inquiring into P's ethnicity, nationality, educational background, and whether the Hartford citizens with whom P interacted could understand him. When P indicated that he would file a grievance against K if he did not stop making such comments, K stated that P should "watch what [he says] or [he] won't be around [for] long." K told other superior officers about his interactions with P and sent a memo to the commander of the police academy, calling P argumentative and confrontational. Thereafter, multiple officers began, for the first time, to label P as argumentative and confrontational in their daily observation reports. One officer wrote a memo noting that numerous daily observation reports were missing from P's file. In addition, days after K sent his memo to the commander, P was contacted about an incident that had occurred seven months earlier during field training, when P lost a piece of the hat to his uniform. When interviewed by the commander, P stated that, at the time he lost the hat piece, he had been ordered by his superior officer to include in his incident report a false statement about another officer, but the commander did not discuss the matter with the officer who purportedly gave P the order. In a memo to the chief of police, the commander of the police academy did not mention P's version of events and instead relied on P's inclusion of the false statement as evidence that there were issues with P's truthfulness. Thereafter, P was involved in an incident during which he responded to a scene where two officers were entwined on the ground with a suspect. P pulled out his Taser but did not use it. When questioned about the incident, P explained that he did not use the Taser because he did not have a clear shot at the suspect or hear the other officers order him to use it. The questioning officer accused P of lying and wrote a memo to the commander of the police academy inaccurately stating that P's failure to follow orders resulted in injury to a fellow officer. Ultimately, the chief of police decided to terminate P's employment, relying on the memos about the hat piece and the Taser incident, as well as P's lack of truthfulness. Before the human rights referee, the police department contended that P's employment was terminated because of his poor performance, his lying in the incident report about the hat piece, his untruthfulness about the Taser incident, and his concealment of his daily observation reports. The referee found in P's favor, concluding, inter alia, that P had established a prima facie case of

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

discrimination on the basis of his ancestry, that the purported reasons for his termination were pretextual, that K had intended to cause the termination of P's employment, and that K's discriminatory animus had tainted other officers' reviews of P. The trial court upheld the referee's decision, agreeing that P had established a prima facie case of discrimination, and the police department appealed to the Appellate Court. The Appellate Court reversed the trial court's judgment, determining that P had failed to establish a prima facie case of discrimination and, alternatively, that substantial evidence did not support the referee's finding of intentional discrimination. With respect to the failure to establish a prima facie case, the Appellate Court reasoned that there was not substantial evidence to establish a sufficient casual connection between K's discriminatory animus and the decision to terminate P's employment. Thereafter, on the granting of certification, P and the commission appealed to this court. *Held*:

1. The Appellate Court incorrectly determined that P had failed to establish a prima facie case of discrimination, as the circumstances surrounding the termination of P's employment gave rise to an inference of discrimination:

   In the context of determining whether discriminatory remarks give rise to an inference sufficient to establish a prima facie case of employment discrimination under Connecticut law, the discriminatory intent of the person who made the remarks may be transferred to the individual who made the adverse employment decision, so long as the employee establishes that discrimination animated the actions of the individual who made the remarks and that there was a causal connection between those actions and the adverse employment decision.

   Although the federal version of the transferred intent doctrine differed from the state counterpart, insofar as the federal version includes the additional requirement that the supervisor with discriminatory animus must have intended to cause an adverse employment decision, it was unnecessary for this court to decide whether that additional requirement was mandated under the law of this state because, even if it was, there was substantial evidence that K intended to cause the termination of P's employment.

   The referee could have inferred that K intended for P's employment to be terminated on the basis of, inter alia, his comment that P should "watch" what he says or he would not be around for long and his history of discriminatory behavior, and the fact that there was other evidence from which another decision maker might have reached a different conclusion about K's intent was of no consequence in light of the deferential standard of review applicable to the decision of the human rights referee.

   With respect to whether there was a causal connection between K's discriminatory animus and the decision to terminate P's employment,

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

there was evidence from which the referee could have inferred that the police chief had reviewed K's memo about his interactions with P, and, even if the police chief did not read K's memo, it was of no consequence because there was substantial evidence from which the referee could have inferred that the decision to terminate P's employment was nonetheless influenced by K's discriminatory animus, insofar as K's memo and vocal complaints about P led other supervisors to complain about P's attitude, which had never previously been an issue, those complaints about P's attitude were included in memos that the police chief did review in deciding to terminate P's employment, including the memo from the commander of the police academy about the hat piece incident, and none of P's evaluations prior to his interactions with K noted argumentative or confrontational behavior, which evidenced a temporal connection between K's memo and the various complaints about P.

2. The Appellate Court incorrectly concluded that the referee's finding of intentional discrimination was not supported by substantial evidence, as the record supported the referee's conclusion that the proffered reasons for terminating P's employment were false and, thus, pretextual:

With respect to the police department's reliance on P's lying in the incident report about the hat piece, the referee credited P's testimony that the issue reemerged nearly one year after the incident occurred and that the issue of P's truthfulness was not raised at the time of that incident but, rather, only after K and other officers complained about P's attitude, the referee noted that the investigation into P's truthfulness was one-sided insofar as it did not include an interview of the officer who purportedly told P to lie in the report, and both of those facts supported the referee's finding that the reliance on the hat piece incident as a reason for terminating P's employment was pretextual.

As to the police department's reliance on P's alleged untruthfulness about the Taser incident, the referee found that the officer who interviewed P about that incident was not credible, that P did not have a clear shot at the suspect upon an independent review of a video recording of the incident, and that no independent investigation was done to confirm or disprove P's version of events, and those findings supported the referee's conclusion that the reliance on the Taser incident as a basis for terminating P's employment was pretextual.

With respect to the claim that P had concealed his daily observation reports, the record supported the referee's finding that K's discriminatory animus influenced other officers to complain about P's poor attitude and truthfulness, creating skepticism about the officer's complaints, including the complaint about the missing reports.

Moreover, the referee's finding that the proffered reasons for terminating P's employment were false was further supported by various other factors considered by the referee, including K's history of discriminatory conduct

347 Conn. 241 JULY, 2023 245

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

toward others, the nexus between K's discriminatory animus and the police chief's termination decision, the increase in negative remarks about P's attitude, the temporal proximity between K's memo to the commander of the police academy and the reemergence of the hat piece issue, and inadequate investigations into the hat piece incident, the Taser incident, and the incidents between P and K.

Furthermore, the referee was justified in concluding that she could not credit or rely on the police department's documentation of P's alleged dishonesty, unprofessional behavior and unsatisfactory job performance in light of her findings that K's discriminatory animus influenced a majority of the documentation, none of P's performance reviews prior to the incidents with K involved allegations of argumentative or confrontational behavior, and the police department's witnesses lacked credibility as a result of their inconsistent testimony.

Argued February 17—officially released July 18, 2023

*Procedural History*

Appeal from the decision of the human rights referee of the named defendant sustaining a complaint of discrimination filed by the defendant Khoa Phan, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Hon. Henry S. Cohn*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment affirming the decision of the referee, from which the plaintiff appealed to the Appellate Court, *Prescott*, *Clark* and *DiPentima*, *Js*., which reversed the trial court's judgment and remanded the case with direction to render judgment sustaining the plaintiff's appeal, and the defendants, on the granting of certification, filed separate appeals with this court; thereafter, the appeals were consolidated. *Reversed*; *judgment directed*.

*Megan K. Grant*, human rights attorney, with whom were *Michael E. Roberts*, human rights attorney, and *James V. Sabatini*, for the appellants (defendants).

*Daniel J. Krisch*, for the appellee (plaintiff).

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

*Opinion*

D'AURIA, J. In this certified appeal, the defendants, Khoa Phan and the Commission on Human Rights and Opportunities (commission), appeal from the judgment of the Appellate Court, reversing the trial court's judgment upholding the decision of the presiding human rights referee (referee), who determined that the plaintiff, the Hartford Police Department, had discriminated against Phan on the basis of his Asian and Vietnamese ancestry by terminating his employment as a probationary police officer. On appeal, the defendants claim that the Appellate Court incorrectly concluded that there was not substantial evidence in the record to support the referee's determination of intentional discrimination because Phan had failed to establish either an inference of discrimination in his prima facie case or, alternatively, that the plaintiff's proffered reasons for terminating Phan's employment were pretextual. Our thorough review of the voluminous administrative record leads us to agree with the defendants, and, accordingly, we reverse the Appellate Court's judgment.

We note initially that the crux of the error that we find in this case lies in the Appellate Court's application of the appropriate standard of judicial review of a referee's factual findings.[1] Therefore, before recounting the referee's findings—necessarily in some detail—we begin with a review of those administrative principles.

"Our review of an agency's factual determination is constrained by General Statutes § 4-183 (j), which mandates that a court shall not substitute its judgment for

---

[1] "[T]he scope of the trial court's review of the [referee's] decision and the scope of our review of that decision are the same. . . . In other words, the trial court's [and/or the Appellate Court's] decision in this administrative appeal is entitled to no deference from this court." (Citation omitted.)) *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 63–64 n.15, 52 A.3d 636 (2012).

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

that of the agency as to the weight of the evidence on questions of fact. . . . [I]t is [not] the function of the trial court [or] of this court to retry the case . . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 503–504, 832 A.2d 660 (2003).

More specifically, "in defining substantial evidence in the directed verdict formulation, [this court] has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Internal quotation marks omitted.) *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022). As a result, "[i]n determining whether an administrative finding is supported by substantial evidence, the reviewing court must defer to the agency's assessment of the credibility of witnesses. . . . Ultimately, [t]he question is not whether the trial court would have reached the same conclusion but whether the record before the [agency] supports the action taken." (Citations omitted; internal quotation marks omitted.) *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 200–201, 596 A.2d 396 (1991).

In the present case, the Appellate Court reversed the trial court's judgment, which had upheld the referee's ruling in favor of Phan, because the Appellate Court determined that substantial evidence did not support

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

the referee's finding of intentional discrimination. *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 208 Conn. App. 755, 757, 789, 267 A.3d 883 (2021). We conclude, however, that the Appellate Court failed to apply properly the standard of review it had correctly recited. Although it is true that, in determining if substantial evidence supports the referee's factual findings, a reviewing court must consider the record as a whole, the Appellate Court here improperly substituted its own judgment for that of the referee as to the weight of the evidence on the dispositive questions of fact. Our deferential standard of review allows for the record to contain competing evidence that would allow a different fact finder to reach a different conclusion. Specifically, in assessing the referee's factual findings, the Appellate Court relied on evidence that the referee explicitly found not to be credible.

The following facts, found by the referee, are important to our review of the defendants' claims on appeal. Phan, who is of Vietnamese nationality, was hired as a police officer for the plaintiff on December 14, 2009. After graduating from the police academy on July 2, 2010, Phan was classified as a probationary police officer. This probationary period lasts for one year, starting with a field training program. Phan participated in this field training program, which consisted of four phases over the span of several weeks and involved different rotations with different field training officers. Phan had to pass each phase of the field training program to move to the next phase. To evaluate his performance, Phan's field training officers completed daily observation reports. Officer Steven Citta was Phan's field training officer for phase I of the program. For phases II, III and IV, Phan's field training officers were, respectively, Officer Tyrone Boland, Officer Vincent Benvenuto, and Citta again. Although Phan did not pass phase II with Boland, and had to repeat that phase with Officer Chris-

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

tian Billings, this did not result in the automatic termination of his employment. During phase IV, Citta noted in his daily observation reports that Phan's skills had improved.

On October 29, 2010, Phan completed the field training program and received a probationary employee performance evaluation indicating that his performance was satisfactory. At this point, Phan was considered a Hartford police officer, but he remained in his probationary period until July 2, 2011, and, therefore, the sergeants in charge during his shifts had to complete daily observation reports for each day that he worked. These daily observation reports evaluated Phan in the areas of appearance, attitude, interpersonal skills, care of equipment, and performance in the following skill areas: patrol, investigation, phones and radios, conflict, report writing, and policies and procedures. After Phan completed the field training program, Sergeants Paul Cicero, David Marinelli, and Steven Kessler, among others, supervised him during his remaining probationary period and evaluated his performance in daily observation reports. These three sergeants had been promoted together and occasionally socialized outside of work. Between October 29, 2010, and February 1, 2011, Phan received several unsatisfactory evaluations regarding specific skills, including some evaluations relating to his uniform. He did not, however, receive any evaluations stating that he was confrontational or argumentative.

Then, in January and February, 2011, two incidents occurred involving Phan and Kessler, who previously had been disciplined for making discriminatory and/or racist remarks.[2] First, on January 23, 2011, Phan asked

[2] In particular, there was evidence of three discrimination complaints filed against Kessler—one by another police officer, another sent anonymously, and a third regarding discriminatory comments about citizens of Hartford. Both the complaint by the other officer and the complaint regarding discriminatory comments about citizens of Hartford were substantiated. Kessler was suspended for six days for his comments to another officer. As to the discriminatory comments about citizens of Hartford, although then Police

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

Kessler to review and sign off on a report about a motor vehicle accident. In addition to other negative comments Kessler made about the report, he told Phan that his report was "probably the shittiest thing I've ever read." Kessler criticized Phan's grammar and threw the report in the trash. Ultimately, however, Kessler approved the report with very few changes. After reviewing the revised report, Kessler asked Phan if the victim involved in the motor vehicle accident was Chinese. Phan stated that he did not know but believed the victim spoke Cantonese. In response, Kessler asked Phan: "What are you?" Phan responded that he was Vietnamese, to which Kessler responded: "Vietnamese, Cantonese, it's all the same shit . . . ." Phan then asked Kessler to sign off on an overtime card, as the edits to the report had caused him to work overtime, but Kessler refused and stated that Phan was lucky he "didn't wipe [his] ass with the report."

Then, on February 4, 2011, Phan asked Kessler to sign a domestic warrant. Kessler again insulted Phan's grammar and report writing skills. Kessler asked Phan if he had gone to college and taken English classes. Phan replied that he had, but Kessler then proceeded to give Phan a fifteen to twenty minute grammar lesson. Afterward, Kessler asked Phan if he was born in the United States. Phan responded that he moved to the United States when he was eleven years old, to which Kessler replied that this explained the problem and that English was a hard language. Laughing at Phan, Kessler asked if the citizens of Hartford had a hard time understanding him. Kessler also stated that criminals must be laughing at Phan behind his back because of his accent. When Phan asked Kessler to stop making these kinds of comments, Kessler replied that he had stripes

Chief James C. Rovella initially proposed a thirty day suspension, after negotiations with Kessler's union representative, Kessler was suspended ten days.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

on his arm so that he was " 'the man' " and would determine when their conversation was over. When Phan stated that he would file a grievance against Kessler if he did not stop his remarks, Kessler ordered Phan out of his office, warning him to "watch what you tell me or you won't be around long." Following these incidents, Kessler told other sergeants about his concerns with Phan, including that Phan had yelled at him.

Approximately two weeks after that February, 2011 incident, Kessler sent a memo to Lieutenant Peter H. Bergenholtz, commander of the police academy, regarding Kessler's interactions with Phan.[3] After Kessler's memo, Phan's ratings in his daily observation reports changed. Before February 4, 2011, none of Phan's evaluations noted confrontational or argumentative behavior. After the incidents with Kessler, however, multiple evaluations from different officers labeled Phan as argumentative and confrontational: the same language Kessler had used to describe Phan's actions. Additionally, two days after Kessler's memo to Bergenholtz, Cicero wrote an interoffice memo to Lieutenant Michael Cacioli explaining that Phan's file, which was supposed to contain his daily observation reports, contained only five of his forty reports. This memo led Cacioli to send an interdepartmental memo to Captain James Bernier, discussing both the lack of reports in Phan's folder and Kessler's memo regarding the February 4 incident.

Moreover, on February 18, 2011, four days after Kessler's memo was sent, Phan was contacted by the police academy about an incident that had occurred on or about July 19, 2010, during phase II of his field training

---

[3] In the memo, Kessler noted that he had followed up with other sergeants who had more frequent contact with Phan and learned that Phan was struggling with his job competency. Kessler also wrote that Phan had been confrontational and argumentative with him, including yelling at him. Kessler recommended in the memo that Phan be " 'unplugged' " from his current assignment and be retrained on the supervisor/subordinate relationship.

program. On that day, Phan had lost his hat piece—the shield on an officer's hat that includes his badge number—while working in the police department's report writing room. Phan reported the lost hat piece to his field training officer, Boland. Boland told Phan to keep looking for the lost item. In August, 2010, another superior officer instructed Phan to write a report about the lost hat piece. In that case incident report, upon Boland's instructions, Phan noted that he previously had reported the lost hat piece to Sergeant Gregory Weston, even though he had not done so. When Weston learned about this false portion of the report, he was angry and ordered Phan to file a corrected report. Phan did so but also explained to Weston that he had acted on Boland's instructions. After receiving a new hat piece in September, 2010, Phan believed the incident to be closed until February 18, 2011, when he was contacted by the police academy with questions about the lost hat piece. Later, Sergeant Jeffrey Rousseau and Bergenholtz interviewed Phan about the hat piece incident. Phan told these men that Boland had ordered him to add the false sentence about Weston into the report. Rousseau and Bergenholtz never interviewed Boland about this issue, however, and did not mention Phan's version of events in their report. Instead, in his memo to the chief of police, Daryl K. Roberts, Bergenholtz relied on Phan's inclusion of the false statement as evidence that there were issues with Phan's truthfulness.

On February 25, 2011, Phan attended a performance review meeting with Bergenholtz and Rousseau. During this meeting, Bergenholtz told Phan that he had heard that Phan had been yelling at Kessler. Phan denied this allegation but indicated that he intended to file a grievance against Kessler. Bergenholtz responded that, if Phan had threatened him with filing a grievance, he would have fired Phan immediately. This statement

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

scared Phan so that he did not further explain his problems with Kessler during this meeting.

Following this meeting, on March 28, 2011, Cicero sent a memo to Cacioli about the February, 4, 2011 incident between Phan and Kessler, as well as the missing daily observation reports. The memo also included a summary of an incident that allegedly occurred on February 15, 2011, in which Phan told Cicero that he had not been trained on how to send a message out through the police department's mobile data terminal system (MDT), despite Citta's statement that he had trained Phan about how to do so. However, Phan did not have a daily observation report documenting the MDT incident or referencing his training on and/or use of the MDT system. Cicero then sent another memo to Cacioli, repeating the issues raised in his prior memos.

Despite these various complaints, Phan continued to receive acceptable marks in his April and May, 2011 daily observation reports. On June 4, 2011, however, another incident involving Phan occurred that was video-recorded from a police cruiser's camera but without audio. Phan arrived at the scene of an incident after Officer Jeffrey Hopkins and Officer Luis Ruiz already were present and standing near the suspect. As Phan approached, lowering his radio, an altercation ensued when the suspect struck Hopkins, causing Ruiz to struggle with the suspect on the ground. Phan pulled out his Taser but did not use it because the other officers and the suspect were entwined on the ground; the referee found, based on her review of the video, that Phan did not have a clear shot at the suspect. Phan put away his Taser, after which the suspect was physically subdued.

After this incident, Sergeant Edward Yergeau questioned Phan about why he did not use his Taser. Phan

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

responded that he did not have a clear shot.[4] Yergeau then asked why Phan did not use his Taser when Ruiz and Hopkins ordered him to do so. Phan responded that he did not hear those orders. Believing Ruiz' and Hopkins' version of the events, however, Yergeau accused Phan of lying because the officers had told Yergeau that they had ordered Phan to use his Taser. Yergeau also disagreed that Phan did not have a clear shot at the suspect. After this discussion, Yergeau wrote a memo to Bergenholtz stating that Phan had been instructed to use his Taser before the suspect struck Hopkins and that Phan's failure to do so resulted in Hopkins being injured. This memo was inaccurate, however, because, in Ruiz' testimony regarding the Taser incident, he stated that he allegedly had ordered Phan to use his Taser after the suspect struck Hopkins, not before.

The plaintiff terminated Phan's employment on June 18, 2011, weeks before his probationary period was scheduled to end on July 2, 2011. Roberts made the decision to terminate Phan's employment, with the approval of the director of human resources, Santiago Malave. Roberts and Malave relied on Bergenholtz' memo about the lost hat piece, even though this memo failed to include Phan's allegation that Boland had ordered him to put the false statement into his report. They also received Yergeau's memo regarding the Taser incident. When Roberts fired Phan, he gave Phan a copy of this memo and told Phan that his lack of truthfulness was one of the main reasons he was being dismissed. Despite Phan's request that he watch a video recording of the Taser incident, Roberts refused.

_____

[4] Although the plaintiff challenged the referee's determination, after her review of the video, that Phan did not have a clear shot at the suspect during the altercation, the plaintiff does not continue to press this challenge before this court.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

Phan filed an Affidavit of Illegal Discriminatory Practice with the commission, alleging that the termination of his employment was a result of his Asian/Vietnamese ancestry. After a hearing and the filing of posthearing briefs, the referee found in Phan's favor, concluding that the plaintiff illegally had discriminated against Phan when it fired him from his position as a probationary police officer. Among other things, the referee ordered the plaintiff to pay Phan $210,596 in back pay, plus $25,000 in emotional distress damages. *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 208 Conn. App. 769.

The plaintiff appealed from the referee's order, and the trial court, *Schuman, J.*, sustained the appeal, "concluding that the referee improperly had applied [a] 'mixed motive' analysis to the discrimination claim rather than a 'pretext' analysis." Id. The trial court remanded the case for a new hearing before the agency. Id.

On remand, the referee again found in Phan's favor, concluding that, under either the mixed motive or pretext analysis, the plaintiff had discriminated against him. In her decision, the referee found that "[Phan's] overall performance had been satisfactory until his meetings with [Kessler]. [Phan's daily observation reports] actually improved steadily after March [2011] until his completion of the probationary period. He was not terminated at the actual time of the lost hat piece, for failing a section of the field training, despite being a probationary employee who could be terminated for almost any reason. The untimely investigation into [Phan's] hat piece, followed by the one-sided investigation into [Phan's] decision not to use his Taser, and the completely discredited testimony of several of [the plaintiff's] witnesses attempting to illustrate [Phan's] untruthfulness regarding the Taser incident, are more than sufficient evidence to prove pretext. There are too many contradictions and inconsistencies to believe that

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

[the plaintiff's] termination of [Phan's employment] was legitimate." (Internal quotation marks omitted.) Id.

The plaintiff appealed from the referee's second decision, and the trial court, *Hon. Henry S. Cohn*, judge trial referee, affirmed the referee's decision but remanded the case to the referee for a new order on damages because the prior order regarding damages was more than four years old. Id., 770 and n.15. The plaintiff appealed to the Appellate Court, claiming that the trial court had improperly held that substantial evidence supported the referee's finding of intentional discrimination. Id., 770. The Appellate Court held that Phan had failed to satisfy his burden of establishing a prima facie case of discrimination and, alternatively, that the record did not support the referee's conclusion that the plaintiff's reasons for terminating Phan's employment were pretextual. Id.

Phan and the commission filed separate petitions with this court for certification to appeal, which we granted, limited to the following issue: "Did the Appellate Court properly reverse the trial court's judgment upholding the decision of the . . . referee on the basis that the evidence was insufficient to support a determination of intentional discrimination?" *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 340 Conn. 919, 267 A.3d 195 (2022); accord *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 340 Conn. 920, 267 A.3d 196 (2022). We will detail additional facts and procedural history as required.

I

The following well settled general legal principles govern both the question of whether Phan established his prima facie case of employment discrimination and whether he established that the plaintiff's proffered reasons for the termination of his employment were pre-

347 Conn. 241        JULY, 2023              257

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

textual, both of which were necessary for him to have established intentional discrimination. "The framework this court employs in [such cases] . . . under Connecticut law was adapted from the United States Supreme Court's decision in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) (*McDonnell Douglas*), and its progeny. . . . Under this analysis . . . for the employee to first make a prima facie case of discrimination, the plaintiff must show: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. . . . The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. . . . This burden is one of production, not persuasion; it can involve no credibility assessment. . . . The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Citations omitted; internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 73–74, 111 A.3d 453 (2015).

II

The defendants claim that the Appellate Court incorrectly determined that Phan had failed to establish his prima facie case. Specifically, they argue that there was substantial evidence to support the referee's finding that a causal connection existed between Kessler's discriminatory animosity and the termination of Phan's employment, creating an inference of discrimination. We agree.

The following additional facts and procedural history are relevant to this claim. After the trial court concluded

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

in the plaintiff's first administrative appeal that the referee had applied the wrong test to the facts she found regarding Phan's discrimination claim, the referee and the parties on remand agreed that no additional hearing or evidence was required. The referee allowed the parties additional opportunity for oral argument and then, relying on her original findings of fact, determined that Phan had satisfied his prima facie burden under the pretext analysis adopted by the *McDonnell Douglas-Burdine*[5] line of cases. As to the fourth prong of the prima facie case—the only prong at issue on appeal—the referee found an inference of discrimination based on Kessler's discriminatory animus, which she found tainted the reviews of other supervisors, culminating in the termination of Phan's employment. In support of this finding, the referee relied on the following facts. First, until his confrontations with Kessler, who previously had been disciplined for making discriminatory and/or racist remarks, Phan's performance reviews and daily observation reports were mostly satisfactory concerning his general attitude. After the two incidents between Phan and Kessler, Kessler complained to other sergeants that Phan was argumentative and confrontational, including in a memo to Bergenholtz. As a result of Kessler's complaints, other sergeants for the first time began making negative comments about Phan's attitude. For example, only after Kessler's complaints did Cicero give Phan negative marks in attitude in his daily observation reports and then write a memo to Cacioli about Phan's maintenance of his reports file. Only after Kessler's complaints did Marinelli give Phan negative marks in attitude in his daily observation reports and then write a memo about his performance deficiencies, including his attitude, which none of his daily observation reports supported. Kessler socialized with,

---

[5] *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

347 Conn. 241 JULY, 2023 259

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

was friends with, and complained about Phan to Cicero and Marinelli.

From this evidence, coupled with Phan's testimony regarding what Kessler had said to him, which the referee credited, the referee determined that Kessler bore a discriminatory animus against Phan based on his nationality. Additionally, the referee found that there was a causal connection between Kessler's discriminatory animus and the termination of Phan's employment—specifically, that Kessler's discriminatory animosity motivated other supervising officers to complain about Phan's attitude. The referee determined that a causal connection could be inferred from the temporal proximity between the incidents with Kessler and the complaints of poor attitude, and the temporal proximity between the incidents with Kessler and the reraising of the lost hat piece issue, which was not sufficiently investigated to determine Phan's truthfulness.

Upon the plaintiff's appeal after remand, the trial court agreed with the referee that Phan had established a prima facie case of discrimination, determining that substantial evidence existed to create a sufficient nexus between Kessler's discriminatory animus and Roberts' decision to terminate Phan's employment. The Appellate Court disagreed with the trial court and the referee, determining that there was not substantial evidence to establish this causal connection because the referee never made a specific factual finding that Kessler's memo was included in the memorandum package Roberts had reviewed. See *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 208 Conn. App. 778. Rather, the referee found that Roberts had access to only two memos, neither of which mentioned Kessler's memo. Id. Additionally, reviewing the record as a whole, the Appellate Court determined that there was no causal connection between Kessler's discriminatory

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

animus and the determination to terminate Phan's employment. Id., 778–85.

The only disputed prong of the prima facie case at issue in this appeal is whether the circumstances of this case gave rise to an inference of discrimination. In determining whether substantial evidence supports the referee's finding that the adverse employment action occurred under circumstances that give rise to an inference of discrimination, mere "speculation of discrimination" is insufficient. *Craine* v. *Trinity College*, 259 Conn. 625, 644, 791 A.2d 518 (2002). Nevertheless, "[t]he level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor." Id., 638. "Circumstances contributing to a permissible inference of discriminatory intent may include . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms . . . or the sequence of events leading to the plaintiff's discharge . . . or the timing of the discharge . . . ." (Citations omitted.) *Chambers* v. *TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Discriminatory remarks by themselves may give rise to an inference sufficient to establish the fourth prong of a prima facie case. Although "stray remarks, even if made by a [decision maker]," "are not sufficient to give rise to an inference of discrimination"; (internal quotation marks omitted) *Fletcher* v. *ABM Building Value*, 775 Fed. Appx. 8, 13 (2d Cir. 2019); discriminatory statements may show that discrimination resulted in an employee's termination when "a nexus exists between these allegedly discriminatory statements and the [employer's] decision to terminate . . . ." (Internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 76. It is not necessary for the decision maker to have made the discriminatory statements himself, but, rather, under certain circumstances, the speaker's discriminatory intent may be transferred to the

347 Conn. 241 JULY, 2023 261

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

decision maker. See *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, 72 Conn. App. 212, 234, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002).

This transferred intent theory for establishing an inference of discrimination has been the subject of several cases in the last two decades, which warrants examination. The seminal case in Connecticut for this theory is *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, supra, 72 Conn. App. 212, which involved a claim of gender discrimination. The hearing officer for the defendant commission[6] found in favor of the defendant employee, Gale Nestor, because, in deciding to terminate Nestor's employment, the decision maker, Martin R. Berr, relied on a letter written by her supervisor, Joseph E. Burns, Jr., who had a discriminatory motive in sending the letter to Berr.[7] Id., 214–16, 220. The employer, Pratt & Whitney Aircraft Division (Pratt & Whitney), appealed from the hearing officer's decision, but the trial court dismissed the appeal. Id., 214. Pratt & Whitney then appealed from that dismissal to the Appellate Court, claiming that

---

[6] Prior to July 1, 1998, General Statutes § 46a-57 referred to the commission's fact finders as "hearing officers." Public Acts 1998, No. 98-245, § 1, replaced the term "hearing officers" with "human rights referees."

[7] The hearing officer found that Nestor's supervisor, Burns, had discriminatory animus against her, leading Burns to send a letter to his manager, Berr, regarding an alleged physical altercation involving Nestor. *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, supra, 72 Conn. App. 216–17, 220. This letter resulted in an investigation that the commission's hearing officer found defective. Id., 232. Although the report produced as a result of this investigation did not state who started the altercation at issue, both Burns and Berr decided that Nestor was at fault. Id. Burns recommended Nestor's termination from employment, and Berr agreed. Id. Based on these facts, the Appellate Court held that Burns' discriminatory intent could be transferred to Pratt & Whitney under the transfer of intent doctrine because Pratt & Whitney had "allowed Burns' defective summation of the incident and his discriminatory motive to taint Berr and, therefore, to taint Pratt & Whitney's decision to terminate Nestor's employment." Id., 234.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

substantial evidence did not support the commission's finding that gender discrimination had occurred because there was no "finding of discriminatory intent or motive on the part of Pratt & Whitney or any of its employees." Id., 233. In rejecting this claim, the court in *United Technologies Corp.* summarized the relevant law on the transferred intent doctrine: "Our law allows for the transfer of intent to discriminate . . . . It is true that [w]ithout some proof of an improper motive, [a plaintiff's] case must fail. . . . Nevertheless, companies may be held liable for discrimination even where the decision-making official did not intentionally discriminate if the information used by that official in deciding to terminate a worker's employment was filtered through another employee who had a discriminatory motive." (Citation omitted; internal quotation marks omitted.) Id., 234–35. The Appellate Court held that, because the information Berr used to decide to terminate Nestor's employment came from Burns, who had a discriminatory motive, "the commission's conclusion that Pratt & Whitney improperly terminated Nestor's employment on the basis of gender was permissible." Id., 235.

Since *United Technologies Corp.*, the United States Supreme Court has recognized a version of the transferred intent doctrine, which it labeled the "cat's paw" theory, in *Staub* v. *Proctor Hospital*, 562 U.S. 411, 415–16, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). In *Staub*, the court "consider[ed] the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."[8] Id., 413. The court noted

---

[8] In *Staub*, Linda Buck, the hospital's vice president of human resources, had terminated the plaintiff's employment at the hospital. *Staub* v. *Proctor Hospital*, supra, 562 U.S. 414–15. Buck's decision to terminate the plaintiff's employment had been based on his personnel file, which included allegedly false complaints from Michael Korenchuk, a supervisor, who previously had made comments hostile to the plaintiff's military obligations. Id. Buck, however, did not adequately investigate Korenchuk's complaint. Id., 415.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

that it was possible that "the discriminatory motive of
one of the employer's agents . . . can be aggregated
with the act of another agent . . . to impose liability
on [the employer]." Id., 418. Specifically, the court artic-
ulated the following standard:[9] "[I]f a supervisor per-
forms an act motivated by [unlawful] animus that is
intended by the supervisor to cause an adverse employ-
ment action, and if that act is a proximate cause[10] of

The plaintiff argued that Korenchuk had fabricated his complaints based
on his hostility to the plaintiff's obligations as a military reservist. Id. A jury
ultimately found that the plaintiff's military status was a motivating factor
in the hospital's decision to discharge him and awarded him $57,640 in
damages. Id.

We note that, although *Staub* was decided under the Uniformed Services
Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C.
§ 4301 et seq. (2006), the United States Supreme Court expressly indicated
in *Staub* that USERRA was similar to Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. See *Staub* v. *Proctor Hospital*, supra, 562
U.S. 417. Because of this, since *Staub*, federal courts of appeals have applied
the holding in *Staub* to Title VII cases. See *Vasquez* v. *Empress Ambulance
Service, Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) ("[O]ur sister circuits have
overwhelmingly adopted the [cat's paw] theory [from *Staub*] in Title VII
retaliation cases. See, e.g., *Zamora* v. [*Houston*], 798 F.3d 326, 332–34 (5th
Cir. 2015) [cert. denied, 578 U.S. 975, 136 S. Ct. 2009, 195 L. Ed. 2d 215 (2016)];
[*Equal Employment Opportunity Commission*] v. *New Breed Logistics*,
783 F.3d 1057, 1069–70 (6th Cir. 2015); *Bennett* v. *Riceland Foods, Inc.*, 721
F.3d 546, 551–52 (8th Cir. 2013); *Hicks* v. [*Forest Preserve District*], 677
F.3d 781, 789–90 (7th Cir. 2012); *McKenna* v. [*Philadelphia*], 649 F.3d 171,
180 (3d Cir. 2011) [cert. denied, 566 U.S. 938, 132 S. Ct. 1918, 182 L. Ed. 2d
773 (2012)].").

[9] The United States Supreme Court explicitly rejected the standard used
by the United States Court of Appeals for the Seventh Circuit: "[U]nder
Seventh Circuit precedent, a cat's paw case could not succeed unless the
[nondecision maker] exercised such singular influence over the [decision
maker] that the decision to terminate was the product of blind reliance.
. . . [T]he singular influence rule does not require the [decision maker] to
be a paragon of independence: It is enough that the [decision maker] is not
wholly dependent on a single source of information and conducts her own
investigation into the facts relevant to the decision." (Citations omitted;
internal quotation marks omitted.) *Staub* v. *Proctor Hospital*, supra, 562
U.S. 416.

[10] The United States Supreme Court defined "proximate cause" under this
cat's paw theory as requiring "only some direct relation between the injury
asserted and the injurious conduct alleged, and excludes only those link[s]
that [are] too remote, purely contingent, or indirect. . . . We do not think
that the ultimate [decision maker's] exercise of judgment automatically

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

the ultimate employment action, then the employer is liable . . . .'' (Emphasis omitted; footnote omitted; footnote added.) Id., 422. The court explained that, ''[w]hen a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision . . . .'' Id., 418–19. ''[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.'' Id., 421. In other words, ''if the independent investigation relies on facts provided by the biased supervisor . . . then the employer (either directly or through the ultimate decision maker) will have effectively delegated the [fact-finding] portion of the investigation to the biased supervisor.'' (Internal quotation marks omitted.) *Rajaravivarma* v. *Board of Trustees for the Connecticut State University System*, 862 F. Supp. 2d 127, 149 (D. Conn. 2012).

This court did not address the transferred intent doctrine until approximately four years after the decision in *Staub*. In *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 67–68, the plaintiff, Doris Feliciano, appealed from the Appellate Court's affirmance of the trial court's judgment rendered in favor of the defendant, her employ-

renders the link to the supervisor's bias remote or purely contingent. The [decision maker's] exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. . . . Nor can the ultimate [decision maker's] judgment be deemed a superseding cause of the harm. A cause can be thought superseding only if it is a cause of independent origin that was not foreseeable.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *Staub* v. *Proctor Hospital*, supra, 562 U.S. 419–20.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

er, Autozone, Inc., on, among other things, a claim that
the defendant unlawfully had terminated her employ-
ment based on her national origin, religion and race, in
violation of the Connecticut Fair Employment Practices
Act, General Statutes § 46a-51 et seq. Specifically, the
plaintiff argued that the trial court and the Appellate
Court incorrectly determined that she had failed to
establish the fourth prong of her prima facie case: that
the circumstances surrounding her termination gave
rise to an inference of discrimination based on her
national origin, religion or race. Id., 77–78. The plaintiff
relied on evidence of the discriminatory animus of
Michael Balboni, who was a manager at Autozone, Inc.
Id., 68, 75, 77–78. In particular, the plaintiff contended
that this animus should have been imputed to the defen-
dant. See id., 75, 78.

In deciding this issue, this court in *Feliciano* cited to
*Staub*, noting that a supervisor's discriminatory animus
may be attributed to the employer if there is a nexus
between the allegedly discriminatory statements and
the employer's adverse employment action, which, in
that case, was its decision to terminate the plaintiff's
employment. Id., 75. In *Feliciano*, however, we deter-
mined that there was not substantial evidence of a
causal connection between the employer's decision to
terminate the plaintiff's employment and Balboni's dis-
criminatory comments because "there [was] no evi-
dence that Balboni ever . . . influenced the
investigation that resulted in the plaintiff's termination
in any way." Id., 78. More specifically, there was no
evidence that Balboni's discriminatory animus influ-
enced the defendant's decision to terminate the plain-
tiff's employment. In reaching this determination, we
clarified that an inference of the defendant's discrimina-
tory intent can be made from another employee's dis-
criminatory animus only if there is "affirmative
evidence of a causal connection between [the employ-

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

ee's] discriminatory animus toward the plaintiff and the defendant's termination of her employment . . . .'' Id., 80.

The plaintiff in *Feliciano* responded that ''the jury reasonably could have disbelieved the defendant's evidence that Balboni was not involved in any way in the decision to terminate her employment, and such disbelief would be sufficient to raise a genuine issue of material fact as to Balboni's involvement.'' (Emphasis omitted.) Id., 78–79. We rejected this argument, explaining that disbelief of an employer's explanation for an adverse employment action is not sufficient to raise an inference of discrimination under the plaintiff's prima facie case, but, rather, such disbelief ''in combination with the plaintiff's prima facie case of discrimination, may, under some circumstances, be sufficient to meet the plaintiff's ultimate burden of proving intentional discrimination . . . .'' (Citations omitted; emphasis omitted.) Id., 79.

Since *Feliciano*, this court has not addressed the ''cat's paw'' theory again, but the Appellate Court did so in *Jones* v. *Dept. of Children & Families*, 172 Conn. App. 14, 16–17, 158 A.3d 356 (2017). In *Jones*, the plaintiff appealed from the trial court's judgment rendered in favor of the defendant. Id., 16. The trial court determined that the plaintiff had not satisfied his burden of showing intentional discrimination because he did not produce sufficient evidence for the cat's paw theory to apply. Id. The Appellate Court upheld the trial court's judgment, noting that, prior to *Staub*, the Appellate Court had recognized ''a transferred intent theory that was loosely analogous to the cat's paw theory of liability articulated in *Staub*.'' Id., 30. In applying the *Staub* cat's paw theory, the court determined that there was no causal connection or nexus between the discriminatory animus of the employee's supervisor and the adverse

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

employment action, making the cat's paw theory inapplicable. Id., 31.

Based on this case law, the Appellate Court in the present case stated that any reliance on the transferred intent theory of liability, as stated in *United Technologies Corp.*, was "misplaced" because it had been replaced by the standard used in *Staub. Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 208 Conn. App. 775. Although it is true that, in *Feliciano*, this court followed the standard used in *Staub*, we have never held that this standard differed from or replaced the transferred intent standard from *United Technologies Corp.* First, although we may use federal case law as guidance in developing our own discrimination law, we are not bound by federal law. See, e.g., *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989). Second, the two standards are more than "loosely analogous . . . ." *Jones* v. *Dept. of Children & Families*, supra, 172 Conn. App. 30. Both the *United Technologies Corp.* transferred intent theory and the *Staub* cat's paw theory require the employee to establish that discrimination animated the supervisor's actions and to show a causal connection between those actions and the adverse employment decision. The only difference between the two standards is that *Staub* requires that the supervisor with the discriminatory animus must have intended to cause an adverse employment decision. We need not decide today, however, whether this additional requirement is mandated under our state's law because, even if we assume that it is, there was substantial evidence that Kessler intended to cause the termination of Phan's employment.

The plaintiff does not dispute the referee's finding that Kessler had discriminatory animus against Phan based on his Vietnamese nationality. Rather, the plaintiff contends that there is no evidence that Kessler

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

intended for Phan's employment to be terminated, or, assuming he did, that there was a causal connection between Kessler's discriminatory animus and the decision to terminate Phan's employment.

As to Kessler's intent, although the plaintiff and the Appellate Court are correct that, in his memo, Kessler did not recommend termination of employment but only retraining, even if we assume that Kessler had to specifically intend for Phan's employment to be terminated and not only that some adverse employment decision take place, this is not the only evidence in the record from which the referee could have inferred Kessler's intent. Phan testified that Kessler warned him during one of their altercations that Phan "better watch what you tell me or you won't be around long." The referee credited this testimony. There also was testimony that Kessler had discussed the February, 4, 2011 incident, including the fact that Phan yelled at him, with other sergeants and members of the police department. Additionally, the referee relied on Kessler's history of discriminatory behavior. See footnote 2 of this opinion; see also *Elston* v. *Talladega County Board of Education*, 997 F.2d 1394, 1406 (11th Cir. 1993) (holding that discriminatory intent may be established by, among other things, history of discriminatory official actions); *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, supra, 72 Conn. App. 230 ("the evidence related to [the coworkers'] prior acts made it more probable that Pratt & Whitney's decision to terminate Nestor's employment was discriminatory in nature"). Given both that the level of proof required to establish a prima facie case is minimal, and that a court's review of the referee's decision is limited and highly deferential, the referee reasonably inferred from this evidence that Kessler intended for Phan's employment to be terminated. See *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

Conn. 503–504; *Craine* v. *Trinity College*, supra, 259 Conn. 638. The fact that there was also other evidence from which another decision maker, including this court, might have reached a different conclusion about Kessler's intent, does not change our determination that substantial evidence supports the referee's finding under our deferential standard of review.

As to the causal connection between Kessler's discriminatory animus and the decision to terminate Phan's employment, the parties' dispute centers on whether substantial evidence supported a finding that Roberts received Kessler's memo, creating the required causal connection to raise an inference of discrimination. The referee made no specific factual finding as to whether Roberts received and reviewed Kessler's memo, but, as explained, our review is not limited to those findings. Reviewing the record as a whole, we agree with the trial court that substantial evidence supported the referee's finding of a causal connection. In particular, there was evidence in the record from which the referee could have inferred that Roberts had reviewed Kessler's memo. Specifically, the referee admitted into evidence a report of disciplinary infraction that Cicero had prepared. Attached to this report were a number of documents, one of which showed that Roberts, Bernier, and Cacioli had signed off on the report, noting that they agreed with Cicero's findings. Cicero's findings, which were stated in a memo to Cacioli, were also attached to the report. Cicero's findings included a detailed discussion of Kessler's memo, the daily observation reports missing from Phan's file, and Phan's various unsatisfactory marks. Also attached to the report was Kessler's memo. Based on the attachments to the report and Roberts' sign-off on the report, the referee reasonably could have inferred that Roberts had reviewed Kessler's memo in making his decision to terminate Phan's employment.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

Additionally, to raise an inference of discrimination based on the transferred intent theory, federal case law, which we find persuasive on this issue, does not require Roberts to have read Kessler's memo for it to have nonetheless influenced his decision. Rather, it is necessary only that the decision maker relied on information that was tainted by the supervising employee's discriminatory animosity.[11] See *Gusman* v. *Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993) ("[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager [with a discriminatory animus]"); see also *Kientzy* v. *McDonnell Douglas Corp.*, 990 F.2d 1051, 1057 (8th Cir. 1993) (same); *Stoller* v. *Marsh*, 682 F.2d 971, 977 (D.C. Cir. 1982) ("When a supervisor . . . deliberately places an inaccurate, discriminatory evaluation into an employee's file, he intends to cause harm to the employee. . . . [T]he employer . . . cannot escape Title VII[12] liability

---

[11] The plaintiff argues that the Appellate Court correctly determined that there was no evidence in the record to support the referee's finding that Kessler's discriminatory animus influenced Roberts' decision to terminate Phan's employment. In particular, the plaintiff argues that "[a] nexus between bias and termination is especially implausible if 'the final termination decision was made after an independent review of the [employee's] performance based on concrete, objective factors' . . . . *Jones* v. *Dept. of Children & Families*, [supra, 172 Conn. App. 31]." (Footnote omitted.) The plaintiff contends that such an independent review occurred here because Roberts based his decision on his review of a package of documents regarding Phan's deficiencies.

This argument fails, however, because Roberts did not conduct any review of Phan's alleged conduct—either independently or through others not tainted by Kessler's discriminatory animus. Rather, he relied solely on the memos, complaints, and evaluations by Phan's supervisors. Reliance on these documents does not constitute an independent review or investigation in the present case because, as explained, there was evidence that Kessler's discriminatory animus influenced the creation of these documents. Notably, for example, neither Roberts nor any other untainted supervisor reviewed the video footage of the Taser incident, despite Phan's request that Roberts do so to verify Phan's recollection of events.

[12] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2018).

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

simply because the final [decision maker] was not personally motivated by discrimination.'' (Citation omitted; footnote added.)), cert. denied, 460 U.S. 1037, 103 S. Ct. 1427, 75 L. Ed. 2d 787 (1983). The referee reasonably could have inferred from substantial evidence in the record that Kessler's memo and complaints influenced other sergeants to complain about Phan's attitude, which never had been an issue, and that these complaints were included in the memos that Roberts reviewed in making his decision to terminate Phan's employment. Importantly, as to which documents Roberts reviewed in making his decision to terminate Phan's employment, the referee specifically found that Roberts received Bergenholtz' June 16, 2011 memo,[13] which stated that ''Phan was found to have been less than truthful with several other supervisors during his probationary review period . . . . Phan previously demonstrated a poor attitude and an unprofessional demeanor when dealing with supervisors . . . .'' Bergenholtz testified that his findings were based in part on ''input from the supervisors who directly interacted with . . . Phan'' and that he obtained input via ''phone calls, emails, [and] through memos'' such as Kessler's. From this evidence, the referee reasonably inferred that references in Bergenholtz' June 16, 2011 memo about multiple instances of a poor attitude with supervisors referred to the complaints from Kessler and other supervisors.

There was also substantial record evidence to support the referee's finding that the complaints from other supervisors referenced in Bergenholtz' memo were influenced by Kessler's memo and vocal complaints, and thus Kessler's animus tainted Roberts' decision. In particular, there was evidence from which the referee

[13] Although not disputed, this finding is supported by Bergenholtz' testimony that he sent this memo with his findings to Roberts and the director of human resources, who, together, decided to terminate Phan's employment.

determined that Kessler, Cicero, and Marinelli were friends—specifically, testimony that they were promoted to sergeant together and socialized outside of work.[14] There also was evidence that Kessler complained to other supervisors about Phan's attitude. For example, there was evidence that Cicero saw Kessler's memo to Bergenholtz because Cicero's March 28, 2011 memo specifically summarizes Kessler's memo. There also was evidence that Rousseau, who revived the investigation into Phan's missing hat piece after the Kessler incidents, was present during the meeting with Phan and Bergenholtz when Bergenholtz addressed Kessler's allegation that Phan had yelled at him. As to Yergeau, who wrote the incorrect and discredited memo about the Taser incident without investigating Phan's side of the story, there was evidence that Kessler had talked to him about Phan.

Finally, there was evidence of a temporal connection[15] between Kessler's memo and the complaints about Phan,

[14] The plaintiff disputes this finding because there was competing testimony in the record showing that these men rarely socialized and were not friends. The referee explicitly did not credit Kessler's competing testimony that these men were not friends but, rather, explicitly credited the testimony that these men socialized outside of work and had been promoted together, from which the referee reasonably inferred their friendship. In reviewing whether substantial evidence supports a factual finding, we cannot rely on uncredited testimony. Moreover, the fact that there was evidence going both ways does not lead us to conclude that substantial evidence did not support the referee's finding of friendship among the three men. Additionally, the plaintiff argues, even if the finding of friendship is not error, this finding cannot raise an inference of discrimination because it improperly presumes that friends will lie for each other. The plaintiff misunderstands the relevance of this evidence. The fact that these men were friends, coupled with Kessler's having complained to them about Phan and the timing of their complaints about Phan's attitude, together raised an inference that Kessler's discriminatory animus influenced their reviews of Phan's performance.

[15] The plaintiff contends that the referee placed too strong of an emphasis on the temporal proximity of these acts. It argues that Kessler's discriminatory remarks were too remote relative to the termination of Phan's employment because several layers of review preceded Phan's termination after Kessler's memo. This argument, however, assumes that Kessler's memo and comments did not influence the other layers of review. As discussed, there

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

and Phan's having been given negative marks in overall attitude from other supervisors.[16] Specifically, prior to February 4, 2011, none of Phan's evaluations noted confrontational or argumentative behavior. Then, in Phan's daily observation report for February 4, 2011, Cicero noted that Phan had been "confrontational [and] argumentative." Similarly, on February 8, 2011, Marinelli gave Phan an unsatisfactory evaluation, noting that Phan had been "resistant, challenging" Marinelli's orders. Later, in Phan's February, 2011 summary evaluation, Bergenholtz inaccurately noted that Phan had received unsatisfactory remarks in overall attitude throughout his probationary period, having been "argumentative" with two supervisors.[17]

was substantial evidence from which the referee could infer that Kessler's memo and comments in fact influenced the other layers of review. See *Rossova* v. *Charter Communications, LLC*, 211 Conn. App. 676, 701–702, 273 A.3d 697 (2022) ("[T]he [employer] mistakenly conflates the concept of temporal proximity evidence with evidence establishing a sequence of events that transpired following the [supervisor's discriminatory comments]. . . . [T]he broader sequence of events leading up to and including an adverse employment decision provides important context that may establish whether there exists a nexus between those two events.").

[16] The plaintiff argues that "the referee's reliance on the fact that Phan's evaluations worsened after the Kessler incidents . . . is 'a textbook illustration of the post hoc ergo propter hoc fallacy.' . . . [Although] 'temporal proximity' can be a piece of the causation puzzle . . . that the Kessler incidents and some of Phan's poor evaluations 'occurred in sequence . . . is insufficient to establish the requisite causal connection.' " (Citations omitted.) But it is not only the fact that Phan received poor evaluations after the incidents with Kessler that allowed the referee to infer a causal connection between Kessler's discriminatory animus and the termination of Phan's employment; rather, the connection is also based on the fact that Phan received multiple, negative reviews regarding his attitude, specifically for being argumentative and confrontational, after the incidents with Kessler, when he never had received similar reviews before the incidents with Kessler. This shows a sequence of events from which the referee could infer a causal connection. See *Rossova* v. *Charter Communications, LLC*, 211 Conn. App. 676, 701–702, 273 A.3d 697 (2002).

[17] Although Phan had received two prior unsatisfactory marks in attitude, neither evaluation contained any note about confrontational and/or argumentative behavior. The first unsatisfactory mark in overall attitude occurred on November 20, 2010, but the note accompanying this mark did not state that Phan was argumentative or confrontational but only that he lacked

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

From these findings of fact, the referee reasonably inferred that the "two supervisors" referenced in Bergenholtz' memo included either Kessler or two supervisors who were tainted by Kessler's memo and vocal complaints about Phan. Thus, substantial evidence supports the referee's finding that Kessler's discriminatory animus influenced the reviews and complaints of other supervisors. This, in turn, provides substantial evidence for the referee's finding that Bergenholtz' reliance on Kessler's memo and the memos of the other supervisors tainted by Kessler's discriminatory animosity allowed for Kessler's discriminatory animus to influence Bergenholtz' memo, which, in turn, influenced the decision of Roberts, who indisputably considered Bergenholtz' memo in making his decision to terminate Phan's employment without conducting any additional, independent investigation.

Nevertheless, the plaintiff argues that the Appellate Court correctly determined that no record evidence supports the referee's finding that Kessler influenced other supervisors to negatively review Phan's attitude.[18]

initiative and had to be told what to do multiple times. The second unsatisfactory mark occurred on December 21, 2010, but the note accompanying this mark merely stated that Phan had been absent and unavailable when needed.

[18] The plaintiff and the Appellate Court improperly relied on *Jones* in asserting that there was not substantial evidence in the present case to raise an inference of discrimination because, as in *Jones*, there was no evidence of a causal connection. This reading of *Jones* ignores our standard of review. In *Jones*, the court was reviewing a trial court's failure to employ the cat's paw theory to find liability. Examining the evidence, the Appellate Court held that substantial evidence supported the trial court's finding of no nexus between the supervisor's discriminatory animus and the termination of the plaintiff's employment. As we explained, the relevant evidentiary standard for making out a prima facie case in combination with the more deferential standard of review of an administrative agency decision allow for the possibility that one fact finder might come to a conclusion different from another fact finder on the same evidence and neither would be reversible. Thus, in *Jones*, the Appellate Court determined that the evidence at issue was sufficient to support the trial court's finding. But that does not mean that the same evidence would not also sufficiently support the opposite finding of a causal connection.

347 Conn. 241 JULY, 2023 275

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

In so arguing, the plaintiff, like the Appellate Court, relies on the fact that there was no direct evidence that Kessler's comments and memo motivated the other sergeants because they all testified that they were not so motivated, and, thus, Kessler played no part in the decision to terminate Phan's employment, as he did not influence the actual decision maker. This argument ignores the fact that the referee found the testimony that they were friends credible over the testimony that the sergeants were not friends, that they did not discuss Phan with Kessler, and that they were not influenced by Kessler. Additionally, this argument ignores the evidence already discussed, which supported the referee's finding that Kessler's comments and memo in fact influenced the reviews of Phan by other supervisors.[19]

Accordingly, substantial record evidence supported the referee's finding of a causal connection between Kessler's discriminatory animus and the decision to terminate Phan's employment, raising an inference of discrimination.

III

Because we conclude that the referee correctly determined that Phan had established his prima facie case, we must address the Appellate Court's alternative holding that substantial evidence did not support the referee's finding of intentional discrimination. We conclude to the contrary that substantial record evidence supports the referee's finding of intentional discrimination.

An employee may satisfy his burden of establishing intentional discrimination, "either directly, with evidence that the employer was motivated by a discrimina-

---

[19] Like the Appellate Court, the plaintiff contends that disbelief of these supervisors' testimony is not enough to establish a causal connection. But, as we explained, the referee did not merely rely on her disbelief of their testimony to find a causal connection but also on other circumstantial evidence.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

tory reason, or indirectly, by proving that the reason given by the employer was pretextual. . . . [E]vidence establishing the falsity of the legitimate, nondiscriminatory reasons advanced by the employer may be, in and of itself, enough to support the trier of fact's ultimate finding of intentional discrimination.'' (Citations omitted; internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 401, 880 A.2d 151 (2005).

In applying this standard, we previously have addressed some confusion over the scope of the plaintiff's burden—specifically, whether the plaintiff must establish both that the employer's proffered nondiscriminatory reason was false and that a discriminatory reason motivated the employer's adverse employment actions. See id., 402–403. On two prior occasions, however, this court has resolved this issue in line with case law from the United States Court of Appeals for the Second Circuit. See id., 403, citing *Gordon* v. *Board of Education*, 232 F.3d 111, 117 (2d Cir. 2000); *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 511–12. For example, in *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 492, the plaintiff employer argued that, to establish pretext, the defendant employee must establish ''both that the [employer's stated] reason was false, and that discrimination was the real reason.'' (Emphasis omitted; internal quotation marks omitted.) Id., 511. We rejected this argument, explaining that the United States Supreme Court specifically has held ''that evidence establishing the falsity of the legitimate, nondiscriminatory reasons advanced by the employer may be, in and of itself, enough to support the trier of fact's ultimate finding of intentional discrimination.'' Id.; see also *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147–48, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Thus, in the present case, Phan was not required

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

to establish both that the plaintiff's proffered reasons were false and that discrimination was the real reason for the termination of his employment.

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the [fact finder] is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. . . . Thus, a [complainant's] prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 508–509. For falsity to establish pretext, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable [fact finder] could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted nondiscriminatory] reasons." (Internal quotation marks omitted.) *Tomasso* v. *Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006).

"This is not to say that such a showing by the [complainant] will always be adequate to sustain a [fact finder's] finding of liability. Certainly, there will be instances [in which], although the [complainant] has established a prima facie case and set forth sufficient evidence to reject the [employer's] explanation, no rational [fact finder] could conclude that the action was

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

discriminatory." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 509. "For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the [complainant] created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." (Internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 516, 43 A.3d 69 (2012). In determining pretext—specifically, in determining whether the record conclusively reveals some other nondiscriminatory reason for the employer's decision—we caution courts reviewing administrative decisions of a referee that this determination must be made while applying our highly deferential standard of review, which requires that a reviewing court abide by a referee's credibility findings and requires a relatively low level of proof, i.e., "something less than the weight of the evidence . . . ." (Internal quotation marks omitted.) *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, supra, 343 Conn. 81. We emphasize that this standard is more deferential than the standard of review applied to findings of fact made by trial courts or juries. See *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 503–504. In General Statutes §§ 46a-57 (b) and 46a-84 (b) (1), the legislature explicitly created a forum and a procedure for addressing workplace discrimination claims, and that procedure is accompanied by specific "limitation[s] on the power of the courts to overturn a decision of [the] administrative agency . . . ." (Internal quotation marks omitted.) *Dufraine* v. *Commission on Human Rights & Opportunities*, 236 Conn. 250, 260, 673 A.2d 101 (1996).

Besides falsity of the proffered reasons, other circumstances from which a fact finder may find pretext include "prior treatment of [the] plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." (Internal quotation marks omitted.) *Jaramillo* v. *Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005). "[L]ow evaluation scores may be a pretext for discrimination, especially [when] . . . an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees." *Tomasso* v. *Boeing Co.*, supra, 445 F.3d 706.

To establish pretext when an employer proffers more than one reason for terminating an employee's employment, the employee generally must submit evidence showing that "each of the employer's justifications is pretextual. . . . However, we recognize that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the [fact finder] could reasonably find the employer lacks credibility. Under those circumstances, the [fact finder] need not believe the employer's remaining reasons." (Citation omitted; internal quotation marks omitted.) *Bryant* v. *Farmers Ins. Exchange*, 432 F.3d 1114, 1126 (10th Cir. 2005); see also *Tomasso* v. *Boeing Co.*, supra, 445 F.3d 707; *Jaramillo* v. *Colorado Judicial Dept.*, supra, 427 F.3d 1308.

In the present case, the plaintiff asserted that its reasons for terminating Phan's employment were "his overall pattern of poor performance, as well as three incidents: (1) lying in an official police report about having lost his hat and hat piece; (2) concealing [his] [d]aily [o]bservation [r]eports; and (3) being untruthful when questioned about a Taser incident." (Internal quotation marks omitted.) *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 208 Conn. App. 785–86. The referee did not believe

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

these reasons, finding: "The untimely investigation into [Phan's] hat piece, followed by the one-sided investigation into [Phan's] decision not to use his Taser, and the completely discredited testimony of several of [the plaintiff's] witnesses attempting to illustrate [Phan's] untruthfulness regarding the Taser incident, are more than sufficient evidence to prove pretext. There are too many contradictions and inconsistencies to believe that [the plaintiff's] termination of [Phan's employment] was legitimate."

The referee did not find the plaintiff's reliance on Phan's lying in the police report about the lost hat piece to be a credible reason because the referee credited Phan's testimony that this issue reemerged only after Kessler and then other sergeants complained about Phan's attitude, nearly one year after the event. In addition to this temporal proximity, the referee determined that this reason was false because there was a one-sided investigation into Phan's truthfulness. The referee's credibility determination is supported by evidence showing that, although Phan told his supervisors that Boland had ordered him to include the false information in his police report, the investigation into the missing hat piece incident did not include interviewing Boland, and the final investigation report did not mention Phan's allegations that Boland had told him to add the false information. The referee also credited Phan's testimony that Rousseau and Bergenholtz did not raise any issues about his truthfulness with him at the time of the hat piece incident but instead that Phan had learned about these issues after his employment was terminated when he reviewed the relevant documents he had received during the discovery phase of this case. These facts support the referee's finding that the hat piece incident was pretextual, masking discriminatory purposes embedded in the termination of Phan's employment.

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

As to the plaintiff's reliance on Phan's alleged untruthfulness when questioned about the Taser incident, the referee did not find this to be a credible reason for the termination of Phan's employment either. Rousseau testified that his review of the video of the Taser incident contributed to his belief that Phan had lied about not hearing Ruiz and Hopkins order him to use his Taser and about not having had a clear shot at the suspect. The referee specifically found Rousseau not credible, however, because, despite his adamant contention that Phan had a clear shot at the suspect during the tussle, Rousseau could not correctly identify the suspect in the video. Further, after her independent review of the video, the referee agreed with Phan that he did not have a clear shot at the suspect. Because of the flaws in Rousseau's testimony and the report about the Taser incident, the referee explicitly found Phan's version of events more credible than the plaintiff's. Specifically, although the referee did not explicitly find that Phan told the truth about not hearing an order to use his Taser, she credited Phan's testimony that, despite Yergeau's writing in a report that Phan ultimately admitted to having heard the order to use his Taser, Phan never said that and maintained that he never heard any order to use his Taser. Additionally, the referee found that no independent investigation was done to confirm or disprove Phan's version of events. Accordingly, the record supports the referee's underlying factual findings that support her conclusion that this reason was pretextual, and we also must defer to the referee's credibility determinations.

The trial court did not specifically address the defendant's third proffered reason for Phan's termination: concealing his daily observation reports. However, in support of her finding of pretext, the referee relied on the changes in Phan's performance evaluations, in

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

particular, in the area of attitude. As we already explained, the referee found, and the record supports, that Kessler's discriminatory animus influenced other supervisors to complain about Phan's poor attitude and truthfulness, creating skepticism about any of the supervisor's complaints, including the issue with the missing daily observation reports. See *Jaramillo* v. *Colorado Judicial Dept.*, supra, 427 F.3d 1308. Additionally, the referee questioned Cicero's credibility, calling into question the veracity of his memo regarding the missing daily observation reports, because Phan's reports did not support the allegations in Cicero's memos about Phan's alleged conduct. Thus, the record supports the referee's finding that all three of the plaintiff's proffered reasons were false.

Under governing case law, the referee's finding of falsity, coupled with Phan's prima facie case, is sufficient to establish pretext. See *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 508–509. This finding of falsity, however, was not the only factor the referee considered in determining that Phan had established his claim of intentional discrimination. In addition to not believing the plaintiff's proffered reasons, the referee relied on the following evidence in making a finding of pretext: the nexus between Kessler's discriminatory animus and Roberts' decision to terminate Phan's employment; Kessler's past history of discriminatory conduct; the increase in negative marks regarding Phan's attitude, a subjective criterion by nature; the temporal proximity of raising the hat piece issue again soon after Kessler's memo; and the inadequate investigation into Phan's allegations about the two incidents with Kessler, the Taser incident, and the incident with Boland and Weston regarding the report of the lost hat piece. These factors, in combina-

Hartford Police Dept. *v.* Commission on Human Rights & Opportunities

tion with Phan's prima facie case and the referee's disbelief of the plaintiff's proffered reasons, further support the referee's finding of pretext.

Nevertheless, the plaintiff argues that "a claim of pretext falters in the face of 'contemporaneous evidence' of poor performance," including documentation of dishonesty, unprofessional behavior, and unsatisfactory job performance from both before and after the incidents with Kessler. As we explained, this argument fails because the referee was justified in finding that Kessler's discriminatory animus influenced a majority of this documentation. As to the unsatisfactory job performance reviews before the incidents with Kessler, as explained, none involved allegations of argumentative or confrontational behavior. The referee found this sudden change in a highly subjective criterion to be pretextual. See *Tomasso* v. *Boeing Co.*, supra, 445 F.3d 706; see also *Williams* v. *Daiichi Sankayo, Inc.*, 947 F. Supp. 2d 1234, 1251 (N.D. Ala. 2013) ("in some instances when a factual dispute exists over a particular evaluation of an employee, a sudden change in evaluation can be evidence of pretext"). Based on that and the referee's determination that the plaintiff's witnesses lacked credibility as a result of their inconsistent testimony, the referee reasonably determined that she could not credit or rely on these documents. As a result of these credibility determinations, coupled with our well established administrative law principles—including those concerning review of decisions of an agency that the legislature established to adjudicate workplace discrimination claims—we will not disturb a referee's factual findings when supported by substantial evidence, as they are here.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.